# EXHIBIT 3

# To Cardinale's Opposition

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-CV-20375-ALTMAN/REID

DAVID FEINGOLD and MICHAEL DAZZO,

Plaintiffs,

vs.

RICHARD CARDINALE, VANIA CARDINALE, RVCNY, LLC, and RVCSI, LLC,

Defendants.
______________________________/

4000 Ponce De Leon Boulevard
Suite 800
Coral Gables, Florida
Tuesday, February 28, 2023
9:31 a.m. - 7:30 p.m.

VIDEOTAPED DEPOSITION OF DAVID FEINGOLD

Taken before Mary Ann Collier, a Court Reporter and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

capital was deployed in -- from an AG 1, Alternative Global 1, to Samson?

A. So I would say cumulative range is 40 to $50 million. And that is a very round, general estimate. But it gives you at least an idea of the magnitude of the operation.

Q. Understood. Alternative Global 2, I think you mentioned that was real estate. But can you give me a little more detail.

A. So Alternative Global 2 is an infrastructure-based discipline. And by infrastructure, what I mean is the vertical integration of the provision of a number of key factors that are done in real estate development for the horizontal part of the business.

So anything, arguably, that goes on at the level of the dirt and below would be infrastructure development. So that would be your water, your electric, your sewer, your gas.

Also incorporated in our particular business model was a road paving, curbing, entitlement, zoning, engineering, space planning, land clearing, grading.

So it was an all-encompassing one stop provision of infrastructure development services, in return for a fixed fee, fixed duration, lot takedown

transaction by a home builder.
Q. So explain that to me. What do you mean by fixed fee, fixed duration? So take me through a transaction. Pick out a number --
A. Sure.
Q. And tell me. Walk me through it.
A. Sure. I will use round numbers to make it easier. So if a typical transaction is a thousand lots, which it's not, because you've got density issues, you've got engineering issues, you've got wastewater issues.
But if we say a particular transaction has a thousand lots and a particular deal is over five years, like I said in the example before, you would deliver 200 lots a year or 50 lots a quarter.
So the key to our business was, number one, there were no option contracts.
Q. Can I stop you there for a second?
A. Sure, sure, sure.
Q. So when you're saying deliver lot, you're saying deliver entitled lots to the ultimate builder?
A. Beyond that. Entitled lots are just blanks.
Q. Got it.
A. In our business, a fully developed lot that we do, with all those levels of services I talked

about, that is extraordinarily unusual. You usually will have 15 or 20 subs performing those services.

Q. Right.

A. We fund all of those services, so that, in essence, if you look at one of our projects and you go there, as a home developer, it's amazing, because the lots already have grass on them and they have the utility hookup pole. You're ready to go vertical.

Q. And then the developer comes in and actually builds the home?

A. The home builder. The home builder comes in, like a DR Horton. They sign what's called an LPA, a lot purchase agreement.

Q. Right. And is that for each individual lot or is there a separate lot for this agreement?

A. No. So, typically, the deal will happen, they'll identify land to us and they will say, "Hey, we love Spartanburg. If you can get us a density of 500 lots, 50 foot lots, fifty-fives and sixties, because they know what the market is, what they can sell them for, if you can get them for us, and here's the price we're willing to pay, we'll give you an LPA, a lot purchase agreement, for all 500 lots, but we won't send you any money until you get us what's called a LDP, a lot disturbance permit.

So there's -- there's risk involved in the business, because, God forbid, you close on a piece of land and you can't let the LDP, you own a piece of land that's not developable. And it happens.

And what else happens is, you may go and you may get an LDP and then you may find out, oh, my God, we just hit rock and we lost 100 lots. Well, that changes all the financial dynamics of your deal.

So we've tried to hedge ourselves in doing this business by, number one, only putting land under contract that we know we're getting the LPA that's non-cancellable.

So we've done deals where we have a non-cancellable LPA. We lose 30 percent of the lots. It changes the financial dynamics of the deal and we have to figure out do we stop this deal? Go into another deal? Is Lennar willing to change the dynamics and pay us more? Because there's a certain amount we have to yield per acre or it doesn't make sense.

But the beauty of the business and why it's so profitable and allows you to pay somebody that 12 to 15 percent, in essence, a preferred return. Right? There's no mortgage from L3 or the Alts on this project, right? So it's a preferred return, it's

unsecured.

But the beauty of it is, because it's so technically difficult for someone to do what we're doing, which is the entire vertical integration, they will pay you a premium for that, knowing it's one group handling it.

So with this particular business, I felt very comfortable, and I know Mr. Dazzo and Mr. Cardinale felt comfortable when I explained it to them, that this is a great business, because we're doing a very difficult business, that has very high barriers to entry.

You know, some guy who's been a grader for ten years, with five kids helping him, he's not getting this done. This is a very technically-complicated business.

**See errata**

So we have the ability to charge premium pricing, to deal with big home builders, which the likelihood of a Lennar or DR Horton going bankrupt is very minimal. They all made it through 2008. They were very successful.

So, guys, this is a great business. I think, my vote is we should put a lot of money here, because this makes sense. This is what I was talking about when I said I want to see businesses with high

a very important business aspect for that. You don't want to cross-collateralize these projects, because if you cross-collateralize and you have a project that's non-performing, the lender is going to take your performing project and that's going to cause havoc. Now, luckily, we have not had any projects that are non-performing.

Q. Let me stop you there. So each SPV has a separate secured loan that it is obligated to pay back. So can you give me a -- is it the seven SPVs you were talking about earlier?

A. That's exactly correct. And there is an email to Mr. Cardinale that lists those seven, and in that email it referenced that there are potentially more projects if we get refinancing.

Because if we could get somebody that would let us take some of the profits out, we know what the profits are on the lot.

To give you round numbers, so acres of land **See errata** outside of Greenville, say, go eight or nine miles outside of Greenville, an acre of land is going to cost you 32,000 an acre. You get four 50 foot lots on an acre, so 32 divided by four is 8,000 a lot. It costs roughly 22,000 a lot to improve it, water, gas, fire, curbing.

**See errata** We can do -- there's one vertical aspect we do. We do the clubhouse component, we do the nature trail, do the guard gate. But, overall, so it's about 22,000 a lot, so we're 30,000 a lot in.

Cheapest lot is sold right now for 63, five. Most expensive lot is sold for 135,000 a lot. So unlevered, if I'm 30,000 into a lot and I can sell it for between 60 and 130, now when you lever, you magnify your returns. That's one hell of a business.

You're literally doubling to quadrupling your money without leverage. That is why I love this business.

Q. And what are the seven SPVs that -- and did Alternative Global 2 invest -- deploy its capital directly into these seven SPVs or did it go through an intermediary?

A. That I don't really recall as I sit here. I know that it got directed. I know that Mr. Cardinale testified he had been to Greenville like eight times. I know he would visit projects with us. We would walk the projects and see the progress.

I just -- I don't recall the names of the SPVs, because they're not like Alt 2 number one, Alt 2 number two. They're just the naming conventions are usually attached to either the geography. If there's

a river by the development, it would be the name of the -- you know, I'm making this up, but Great Falls, LLC, if it's near the Great Falls River. So it would usually be something like that.

Q. Like location-specific SPVs?

A. Sure, sure. Or the name of the highway.

And then the other thing that's really unusual about the business is, you can do this, and then all of a sudden the city comes in and the city will tell you they want you to change the name of the development. It's all a marketing thing.

Q. Sure.

A. So that's rather an interesting aspect of the business and what goes on.

Q. And so does Alternative Global 2 then have 100 percent equity stake in each one of these SPVs or --

A. No way.

Q. What's the equity stake that --

A. No.

Q. -- that Alternative Global 2 has in each specific SPV?

A. Each deal is different. Each plot of land is different --

Q. Okay.

A. -- which obviously affects the financial dynamics of the deal.
Q. Sure.
A. I mean, a small deal -- we'll do a small deal that's 200 lots and then we'll do a huge deal that's 7,000 acres.
Q. Right.
A. So it's -- and it takes multiple participants in order to make the deal happen. Because, remember, a lender is not going to give you your debt until cash is deployed in the deal. So every deal --
Q. You have to have some skin in the game.
A. Yes. Yeah. They are not going to go in first.
Q. Right. So then what is the transaction document or documents between Alternative Global 2 in each one of these seven SPVs? Like how does the money get contributed?
A. So whatever percentage of the project Alternative Global 2 is, it would get that percentage of the cash flow.
So I know on the seven projects, when the spreadsheet was put together, it reflected that, I don't remember the exact numbers, but, say, 12 or 12 and a half million from Alt 2 was put into

infrastructure. And we know what we're getting paid back.

Q. But that's 12 and a half --

MR. WELTZ: Hold on. Let him finish.

BY MR. BENAYOUN:

Q. I thought you were done. Go ahead.

A. That's okay. So that 12 and a half million is earmarked to get $17 million back, which, say, is like a 50 percent return.

And the reason we know that to be the case is because we know what the lot price is, we know what the lot takedown schedule is, we know what our debt schedule is. So it's fairly easy to figure out what the return is going to be.

Now, the IRR is going to be influenced by how quickly the lots get taken down, because although the builders have to take down a minimum number of lots per quarter, they can always take down more. So think about that.

So my example I gave to you before, a builder has to take 50 lots a quarter. Right? But what happens if all of a sudden we are in Raleigh, which is a hot market, and they say, "You know what? We want to take 100 lots a quarter."

Likely, based on zoning, we have the entire

project done. Very cash heavy in the beginning, because the local governments don't want you doing this in phases, because now you have trucks out there for five years. So they'd rather have you come in the first year or two, complete your work, have all the lots ready, and then the builder keeps taking them down.

**See errata**

So there are ways to actually get better returns. Let's say in the deals that we talked about in the spreadsheet I gave Mr. Cardinale, let's say that 12 and a half million, that's 17 million at 50 percent return we expect, if they just take down lots based on the minimum lot takedown they've guaranteed, if they accelerate that on an APR basis, the return goes up extraordinarily. Right?

**See errata** You're still going to get that 17 million, but instead of getting it over five years, they could get it over two and a half years, so your APR goes up significantly.

Q. And so that 12 and a half million that you referenced that, you know, AG 2 deployed into the SPVs, is that into one SPV or across all seven?

A. No. It's across the seven deals. It was allocated over the seven deals.

Q. Okay. And so do the transaction documents

rely on a banker to have discretion.

[redacted]

A. That's over time, by the way. That wasn't one lump sum.

Q. And is all that money now put to work?

A. Yeah, it's all been deployed.

Q. So it's all been deployed.

A. Yep. Uh-huh.

Q. I would except that AG 2 gets some paper back memorializing what it put in, and saying, "Okay, you know, you put in, you know, 1.2 million and you **See errata** getting, you know, whatever percentage of this SPV."

So what is that document?

A. So I created a spreadsheet at the end of 2021 for myself, Mr. Cardinale and Mr. Dazzo for a valuation of our business. And we would annually look at our business and a valuation.

It was Mr. Cardinale's responsibility to keep and collect all back-office documents regarding all of the Alts. That's been our position you know in the lawsuit.

Q. I understand your position.

A. That's what he was paid for.

Q. Go ahead.

A. And so he traveled to Greenville eight times. He had access and the ability to collect documents. I assume he got them. He says he doesn't have documents. I guess we'll let a jury decide. But the point is is it was his responsibility to keep those documents for our business.

Q. Who would he get those documents from?

A. He would get those documents from the manager of each of those SPVs.

Q. Who are the managers of each of those SPVs?

A. Each is different. It's a different entity. I mean, I, myself, don't even have physical possession of those. They are kept on a third-party server, because there was an extraordinary concern about Mr. Cardinale participating in the business, because he had told other people that he was an accomplished developer, that he was doing a big project in Leesberg, Florida, and there was a concern about how much access that he should be entitled to.

So, therefore, when I look at things, even to this day, none of the things that I look on are on my server, my computer. It just is not. And that's out of respect for all of the people involved.

And not just, you know, regarding Mr. Cardinale, but anybody that would participate in these

Q. All part of the same discussions that you had with Mr. Howard?
A. All part of the same -- I mean, I have daily, weekly --
Q. I understand.
A. -- four times a day discussions with him. But --
Q. I'm just focusing on this time period.
A. All part of budgeting the capital deployment.
Q. So let's go back to the -- well, before we do that --
A. Sure.
Q. -- Alternative Global 5.
A. Yes.
Q. I know you said Alternative Global 3 is debt settlement. You had very little to do with that.
(Reporter clarification.)
Q. Alternative Global 3 was debt settlement and I believe you testified you had very little to do with that.
A. My involvement was very minimal in that.
Q. So Alternative Global 5.
A. Alternative Global 5 is Culver's. Culver's Restaurant, C-u-l-v-e-r-s. I estimated, I don't recall exactly, I think between half a million and a

million dollars was put towards these two restaurants. One is open and operational. The other is in the midsts of being developed.

And if my memory serves me correctly, I believe Alternative Global 5 is entitled to 40 percent of the excess earnings.

Q. AG 5?

A. Yeah.

Q. I think you said two. But AG 5?

A. I'm sorry. Did I say 2? Yeah, AG 5 is the Culver's and I believe Alternative Global 5 is entitled to 40 percent of the earnings in excess of the expenses on the restaurants.

Q. Who's entitled to the other 60 percent?

A. I don't know exactly as I sit here today. Again, there's -- I believe there is a SPV that we set up with the manager of the restaurant. And her name is Jennifer, and I don't remember her last name.

She's the one that went to -- they have some kind of burger school that they have to live in Wisconsin for two months. And so -- and I think she got 20 percent, because Culver's has this formula where managers are required to have big equity to be able to be interested in the operations. **See errata**

I believe -- so that she's at 20 percent. If

Alternative 5 is at 40, that's 60 percent. The remaining 40 percent I believe is somehow divided with Josh Howard and people that he's involved with. And I'm not 100 percent sure who that is. I would be guessing.

[redacted]

Q. And did it work the same way? Did you have the discussions with Josh Howard on how the capital was going to be brought in on behalf of AG 5 or who did you have the discussion with?

A. That I don't remember, because that wasn't my like infrastructure, where there's constant **See errata** communication. That was a very short and quick deal, **See errata** I would say. That was -- that was Culver's was looking for someone in the Carolinas to open a few stores.

I think -- I think Josh had a relative or something that knew about it and convinced him this is a great deal. And I did -- I did see like the UFrOC, the Uniform Franchise Offering Circular. So I did see that and did notice in those UFrOCs they have to tell

what you the worst producing store does, what the best producing store does and what the average producing stores do.

So it was really interesting to me, because at the time that I saw it, it's a very successful burger chain. I think the -- I think at the time that we looked at the deal, they had never closed a single shop and they had a thousand or 1,011 franchises. And I think the lowest grossing **See errata** did, like, 120,000 a year, and I'm talking profits. And the highest grossing one did, like, I want to say four and a half million a year in profits.

So, you know, for a restaurant business, that's pretty miraculous to have a thousand stores and not have to close one. I think now I did hear rumors that they actually have closed one since. **See errata**

But the point is, I saw that, and I think Culver's is pretty much on top of the way deals are structured. My recollection is is they went through the process of approving the participation. And I did say before, I -- I recall a document with a Culver's like trademark on it, their insignia in blue, and I'm -- I mean, I seem to recall Mr. Cardinale's name on that, and maybe it was on behalf of the Alternative Globals, but I seem to recall him being put on a

A. So I don't know. I really don't know. I don't know what he's got in his files.

Q. But you never -- I think you testified you don't recall seeing the document.

A. Well, I recall seeing a Culver's document. I recall seeing one that I thought Mr. Cardinale's name was on. I recall seeing that there's this grid-looking document that breaks down percentages. Yeah, I do recall seeing those documents.

Q. And the document, putting aside the one, the disclosure that you believe that Mr. Cardinale's name was on it, the document that has the breakdown of the interest, do you recall, did you send that or give that to Mr. Cardinale?

A. I don't recall either way. I just do not. Like I said, it was a very short deal in terms of I think from the time we heard about the Culver's to the time that we all agreed to do the deal was maybe 60 days. It was a very short timeframe.

Obviously, it took much longer to develop them, but in terms of agreeing to do the deal, it's a very small deal. It's, I don't know, five, $600,000. And I'm talking --

Q. Small is relative.

A. Well, when you compare it to an

infrastructure deal, yes. But my point is is that's the amount of cash capital, not debt. Right? Each store costs several million dollars to build.

THE VIDEOGRAPHER: Off the record at 4:06.

(Thereupon, a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: Back on the record at 4:27.

BY MR. BENAYOUN:

Q. I think we're up to AG 6.

A. Okay.

Q. So can you tell me what AG 6, where did AG 6 deploy its capital?

A. Alternative Global 6 was focused on the home building discipline, primarily, with housing developments that were being built through a company known as Durham Homes.

Q. And was there a set of transaction documents or document memorializing the deployment of capital into Durham Homes?

A. There were.

Q. And what were those documents?

A. I recall that there was a joint venture agreement, and I recall that there was a note and mortgage or just a note. There was -- there was a

financial instrument involving debt, and I think it was a note and mortgage.

Q. And who drafted the JV agreement?

A. I may have, because I saw the form and it looked like something that would come from me. But I don't recollect drafting it.

Q. Okay. Fair enough.

And then the note and mortgage, who drafted that?

A. I think that note and mortgage, I think it may have originally come from Steve Cohen's office and I think I may have amended it.

Q. And how much capital did AG 6, Alternative Global 6, deploy into Durham Homes through those two documents?

A. So I believe it was somewhere around $6 million. And I'm guessing, but I think that is about the number. I don't know that the debt instrument was executed simultaneously, although it may have been dated simultaneously, if that makes sense.

For some reason, I feel like it was executed at a later time, based on my recollection of conversations that took place.

Q. And how much was paid back on that $6 million investment?

A. I recollect I believe a payment of 350,000 or something to that effect, or 336 -- 336 maybe. In the three-hundreds. I will say that. I don't remember exactly what it was.

And then there was another payment that was either 200 or 250. A round number, I think.

Q. So then that leaves a balance that's still due and owing, plus whatever profits, the 50 percent profit share, of around 5.5 million, plus interest, and whatever profit share. Is that accurate?

A. No, I think that is not accurate. That's not the way the deal was structured.

Q. So what -- what is owed on the note and the JV agreement?

A. I believe that there is nothing owed on the note and that there is an amount to be determined based on Alt 6's participation in the project. Alt 6 defaulted and refused to continue funding.

The joint venture, from what I recall, was that Alt 6 was to be the sole provider of funds to the Joint Venture and that Alt 6 stopped funding. So there has been significant capital that has been provided to Durham since Alt 6 stopped funding, and, therefore, there has to be a determination as to what the value of that is.

A. To have all the documents. In conjunction with my email to him in December of 2019, confirming all of his job duties, I would have expected, if he took that money, he would have been doing his job. It was not my responsibility.

What you're basically saying to me is analogous to you going to a person who performed surgery and saying that somebody else in the operating room should have done their job.

No. I was paid to do my job. I did it. You will never change my position on doing it. I did it. He was paid to do his job. He did not do it. He took the money and did not do it.

Q. Again, you're repeating almost verbatim what you've been saying all, you know, all day. But that's okay. We have the record. How about a much simpler question?

A. Sure.

Q. Are you aware if Durham Homes ever declared a default in writing to Alternative Global 6?

A. I do not know whether they did or did not.

MR. BENAYOUN: I'm going to just take a quick five minute break.

THE VIDEOGRAPHER: We're going off the record at 6:07.

| | | | |
|---|---|---|---|
| 177 | 15 | insert "a" after "is" | typo |
| 183 | 13 | insert "you know" after "for" | typo |
| 185 | 3 | insert "which specializes" after | |
| | | "Setanta" | typo |
| 186 | 19 | "acre" not acres" | typo |
| 187 | 1 | "even" not "can" | typo |
| 191 | 6 | insert "just" after "builder" | typo |
| 191 | 16 | "They're" not "You're" | typo |
| 194 | 12 | "you're" not "you" | typo |
| 197 | 23 | insert "to" after "entitled" | typo |
| 199 | 14 | insert "that" after "had" | typo |
| 199 | 23 | "AG2" not "Alternative | |
| | | global 2" | typo |
| 200 | 6 | insert "And" before "so" | typo |
| 201 | 3 | Insert "You know" before "it's" | typo |
| 205 | 25 | "records" not "orders" | typo |
| 206 | 19 | "receivables" not "receivable" | typo |
| 206 | 21 | insert "ok" after "in." | typo |
| 213 | 8 | delete "give me a" | typo |
| 214 | 1 | should be "we may have e-signed | |
| | | it" not "maybe he signed it" | typo |
| 217 | 6 | insert "even" after "putting" | typo |
| 218 | 11 | insert "was it" after "or" | typo |
| 220 | 23 & 24 | delete "to be able" | typo |
| 221 | 15 | delete "my" | typo |
| 221 | 17 | insert "if" after "deal" | typo |
| 222 | 9 | insert "one" after "grossing" | typo |
| 222 | 16 | delete "since" | typo |
| 229 | 10 | "funding" not "funning" | typo |

**CONFIDENTIAL INFORMATION**