# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 22-CV-20375-ALTMAN/REID

DAVID FEINGOLD AND MICHAEL DAZZO,

      Plaintiffs,

    vs.

RICHARD CARDINALE, VANIA CARDINALE, RVCNY, LLC AND RVCSI, LLC,

      Defendants.

---

DAVID FEINGOLD MICHAEL DAZZO, BLACKSTREAM DEVELOPMENT, LLC, DURHAM HOMES USA, LLC,

      Plaintiffs,

    vs.

RICHARD CARDINALE,

      Defendant.

1

## FIRST CONSOLIDATED COMPLAINT

Plaintiffs David Feingold ("Feingold"), Michael Dazzo ("Dazzo"), Durham Homes USA, LLC ("Durham"), and Blackstream Development, LLC ("Blackstream") (collectively, "Plaintiffs") complain of Defendant Richard Cardinale ("Cardinale"). Feingold and Dazzo further complain of Defendants Vania Cardinale ("Vania"), RVCNY, LLC ("RVCNY") and RVCSI, LLC ("RVCSI") (together with Cardinale, "Defendants"). Plaintiffs' allegations for their First Consolidated Complaint are as follows.

### INTRODUCTION

1.      Feingold and Dazzo filed *David Feingold and Michael Dazzo v. Richard Cardinale, Vania Cardinale, RVCNY, LLC and RVCSI, LLC,* Case No. 1:22-cv-20375-ALTMAN/REID (the "First Filed Case") for failure to pay fair value for their ultimate membership interests in various limited liability companies, breach of fiduciary duty, conversion, fraudulent misrepresentations, conspiracy to commit fraud, civil conspiracy, aiding and abetting breach of fiduciary duty and unjust enrichment.

2.      After the initiation of the First Filed Case, Cardinale began to engage in vexatious and unauthorized litigation against Plaintiffs under the guise of the various limited liability companies for which Feingold and Dazzo seek fair value.

3.      Cardinale's doing so is a blatant attempt to subvert the orders this Court has entered against him in the lawsuit Feingold and Dazzo filed against him in this Court, the First Filed Case, and to harass Plaintiffs and damage them.

4.      Through a declaratory judgment action, Plaintiffs ask this Court to end Cardinale's unauthorized litigations.

5.      Feingold and Dazzo also continue to seek judgment against Defendants for failure

to pay fair value for Feingold and Dazzo's ultimate membership interests in the various limited liability companies, breach of fiduciary duty, conversion, fraudulent misrepresentations, conspiracy to commit fraud, civil conspiracy, and aiding and abetting breach of fiduciary duty.

<u>PARTIES, JURISDICTION AND VENUE</u>

6.      Feingold is a citizen of the State of Florida who resides in the Southern District of Florida. For purposes of this Complaint based on diversity of citizenship, Feingold is a citizen of Florida.

7.      Dazzo is a citizen of the State of Florida who resides in the Southern District of Florida. For purposes of this Complaint based on diversity of citizenship, Dazzo is a citizen of Florida.

8.      Blackstream is a real estate development limited liability company organized under the laws of the State of South Carolina with its principal place of business in the State of South Carolina. The members of Blackstream are citizens of South Carolina. No member of Blackstream is a citizen of the State of New York. For purposes of this Complaint based on diversity of citizenship, Blackstream is a citizen of South Carolina.

9.      Durham is a production home building limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of South Carolina. The members of Durham are citizens of South Carolina. No member of Durham is a citizen of the State of New York. For purposes of this Complaint based on diversity of citizenship, Durham is a citizen of South Carolina and Delaware.

10.     Cardinale is a citizen of the State of New York who resides in Staten Island, New York. For purposes of this Complaint based on diversity of citizenship, Cardinale is a citizen of New York.

11.     Vania is a citizen of the State of New York who resides in Staten Island, New York. For purposes of this Complaint based on diversity of citizenship, Vania is a citizen of New York.

12.     RVCNY is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCNY" stands for "Richard Vania Cardinale New York."  Cardinale and Vania, both citizens of New York, are claimed by Cardinale to be the only members of RVCNY.  As detailed below, RVCNY is an alter-ego entity of Cardinale.  For purposes of this Complaint based on diversity of citizenship, RVCNY is a citizen of New York.

13.     RVCSI is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCSI" stands for "Richard Vania Cardinale Staten Island." Cardinale is a citizen of New York and Cardinale claims to be the only member of RVCSI, LLC.  As detailed below, RVCSI is an alter-ego entity of Cardinale.  For purposes of this Complaint based on diversity of citizenship, RVCSI is a citizen of New York.

14.     Diversity jurisdiction over this matter is proper because complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

15.     This Court has subject matter jurisdiction over the declaratory judgment action pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, which allows federal courts to issue declaratory judgments in cases that present a valid basis for diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

16.     This Court has personal jurisdiction over Defendants through Defendants transacting, doing, and soliciting business in this District, and because a substantial part of the events occurred in this District. Cardinale, in particular, has operated, conducted, engaged in, or

carried on business or business ventures in Florida. Cardinale's specific connections to Florida, include, but are not limited to:

    i.    Cardinale is an ultimate managing member of Alternative Global Management, LLC ("AGM"). Feingold and Dazzo, both of whom are Florida residents, are the other two ultimate managing members of AGM. Cardinale, Feingold and Dazzo designated Florida as the location for AGM's principal and registered offices.

    ii.    Cardinale, Feingold and Dazzo also formed Alternative Global One, LLC ("AG1"), Alternative Global Two, LLC ("AG2"), Alternative Global Three, LLC ("AG3"), Alternative Global Four, LLC ("AG4"), Alternative Global Five, LLC ("AG5") and Alternative Global Six, LLC ("AG6") (collectively, the "Alternative Numbered Entities" or "AG1-6"), which are entities with principal and registered offices in Florida.[1]

    iii.    Cardinale has represented to Feingold and Dazzo that he is the largest developer in Leesburg, Florida, and that he has made millions of dollars from his Florida developments.

    iv.    Defendants did not move for dismissal of the First Filed Case for lack of personal jurisdiction.

    v.    Cardinale has sued Feingold and Dazzo in Florida state court: *Richard Cardinale v. David Feingold, Michael Dazzo, Daniel Amaniera, and Todd Sanders,* Case No. 2024-000809-CA-01 (11th Judicial Circuit, Miami-Dade

---

[1] AGM and the Alternative Numbered Entities are collectively referred to as the "Alternative Global Entities."

County Florida). In that case, Cardinale alleges Feingold and Dazzo interfered with Cardinale's investors located in Florida. Specifically, he alleges, "[m]any of the Investors were friends, family, or individuals with whom Cardinale had long-standing relationships, either as clients or investors in Cardinale's previous ventures. Some of these Investors are residents of Florida."

vi.   Cardinale has, without authorization, filed suit in the names of the Alternative Numbered Entities against Feingold and Dazzo in Florida state court: *Alternative Global One, LLC, et al. v. David Feingold and Michael Dazzo*, Case No. 2023-000688-CA-01, Section CA43 (11th Judicial Circuit, Miami-Dade County, Florida). In that action, Cardinale alleges that venue in Florida state court was because "[c]ertain of the causes of action herein accrued in Miami-Dade County, Florida insofar as (i) the principal offices of the DCG Entities (as defined below) are located in Miami-Dade County, Florida; and (ii) the books and records of the DCG Entities (as defined below) are located in Miami-Dade County, Florida." Upon information and belief, Cardinale is an ultimate owner of the aforementioned DCG Entities.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

<u>FACTUAL ALLEGATIONS SUPPORTING PLAINTIFFS' DECLARATORY JUDGMENT ACTION AGAINST CARDINALE</u>

18.     In or around the summer of 2019, Cardinale asked Feingold and Dazzo to be co-managers of an investment fund he was forming, the L3 Capital Income Fund.

19.     Feingold and Dazzo declined Cardinale's invitation and explained to him they had no desire to be fund managers, that their offices were not set up to service and administer a fund

of retail investors, and that they had several outside businesses that would not allow them to devote the time necessary to manage and operate a fund.

20.     Cardinale, however, made numerous representations to Feingold and Dazzo to ultimately induce them to go into business with him. Feingold and Dazzo later discovered Cardinale's representations were untrue.

21.     Prior to going into business with each other, Feingold and Dazzo told Cardinale that they were only looking for a source of non-recourse funding to pursue various business opportunities, including merchant cash advance and real estate.

22.     Cardinale, Feingold and Dazzo thereafter ultimately agreed that:

    i.      Cardinale's investment fund, the L3 Capital Income Fund, would be the lender for Feingold and Dazzo's intended business endeavors;

    ii.     Cardinale, Feingold and Dazzo would be made equal equity owners of those businesses; and

    iii.    Cardinale, Feingold, and Dazzo would receive the funds left over after loan payments were made.

23.     The Alternative Global Entities were thereafter created. As noted above, the Alternative Numbered Entities are:

    i.      AG1 (focusing on the merchant cash advance industry);

    ii.     AG2 (focusing on infrastructure and real estate development);

    iii.    AG3 (focusing on the debt-settlement industry);

    iv.     AG4 (focusing on developing real estate);

    v.      AG5 (focusing on the fast-food industry and hospitality); and

    vi.     AG6 (focusing on home building).

24.     AGM and AG1 were the first entities formed. AG2 through AG6 were formed thereafter with AG6 being the last of the entities formed in or about July 2020.

25.     On November 19, 2019, Feingold, Dazzo and Cardinale executed the Operating Agreement of AGM ("AGM Operating Agreement"), attached hereto as **Exhibit 1**.

26.     That same day, on November 19, 2019, Feingold, Dazzo and Cardinale executed the Operating Agreement of AG1 ("AG1 Operating Agreement"), attached hereto as **Exhibit 2**.

27.     On May 19, 2020, Feingold, Dazzo and Cardinale executed the Operating Agreement of AG2 ("AG2 Operating Agreement"), as well as the Operating Agreement of AG3 ("AG3 Operating Agreement"), attached hereto as **Exhibits 3 and 4**.

28.     On June 12, 2020, Feingold, Dazzo and Cardinale executed the Operating Agreement of AG4 ("AG4 Operating Agreement"), attached hereto as **Exhibit 5**.

29.     On July 8, 2020, Feingold, Dazzo and Cardinale executed the Operating Agreement of AG5 ("AG5 Operating Agreement"), as well as the Operating Agreement for AG6 ("AG6 Operating Agreement"), attached hereto as **Exhibits 6 and 7**.

30.     Section 4.1 of each of the Alternative Numbered Entities' Operating Agreement lists Feingold, Dazzo and Cardinale as the initial Members:

## ARTICLE IV. – MEMBERS

4.1 Members: The names of the initial Member for formation purposes is:

| Name | Capital Contribution | Percentage Interest |
|------|---------------------|--------------------|
| David Feingold | $100 | 33.33% |
| Richard Cardinale | $100 | 33.33% |
| Michael Dazzo | $100 | 33.33% |

(Exhs. 2-7).[2]

31.     Article VII of the Operating Agreement for each of the Alternative Numbered Entities sets forth the process for (a) the assignment of membership interests, (b) the admission of assignees as substitute Members, and (c) the redemption of the membership interest of a non-initial Member (*i.e.*, an entity or person other than Feingold, Dazzo and Cardinale):

## ARTICLE VII. – ASSIGNMENT OF MEMBERSHIP INTERESTS

7.1 Assignment of Membership Interests: A Member may assign his or her membership interest in the Company in whole or in part. The assignment of a membership interest does not in and of itself entitle the assignee to become a Member. The assignee is only entitled to receive, to the extent assigned, the distributions the assigning Member would otherwise be entitled to, and the assignee will only become an assignee of a membership interest and not a substitute Member.

7.2 Substitute Members: An assignee of a membership interest will be admitted as a substitute Member and will be entitled to all the rights and powers of the assignee only if the other Members unanimously consent. If admitted, the substitute Member has, to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of a Member.

7.3 Redemption of Member: Any Member who is not an initial member as identified in Article IV, subsection 4.1 above, may have their Membership interest redeemed upon such terms and conditions as so determined, by the sole and absolute discretion of the unanimous consent of the above listed initial members whose names appear in Article IV, subsection 4.1.

(Exhs. 2-7, Article VII).

32.     After creating the Alternative Global Entities, Feingold, Dazzo and Cardinale assigned their membership interests in the Alternative Numbered Entities to AGM and admitted AGM as a substitute member in the Alternative Numbered Entities pursuant to Sections 7.1 and 7.2 of the Alternative Numbered Entities' Operating Agreements. This substitution is confirmed by:

>    i.    Declarations of David Feingold and Michael Dazzo attached hereto as **Exhibits 9 and 10**.

---

[2] On February 21, 2021, AGM amended its operating agreement. The amended and restated operating agreement for AGM is attached hereto as **Exhibit 8**.

ii.   Cardinale's text message to Feingold on July 28, 2021:



Wednesday, July 28, 2021

**RC**   Rich, 8:12 AM

Good morning, what's doin? are we still shooting for 10am on Friday? I will get into the city either way. Can you email me or bring how we own our pieces of the hotels, the 5% each we left ourselves of each and anything else you think is helpful? Also the alternate globals we own through Alternate Global Management so if possible can you bring or send whatever we can go over for Alt 2 Alt 4  Alt 5 and 6. That's our Realestate and Culver's assets.  It would really help to get this all in my brain updated for this next capital raise, also super helpful for what I need for the people working on my planning.  Anything else you think we should cover while we are together would be good. Let me know, thanks brother. Hit me up  if you want to talk at all.

8:24 AM

Sounds good, How about we shoot for 12.  Meet at the four seasons in the financial district. That way I get my morning meeting done and I am free with nothing after us so there is no rush and we can spend as much time together as needed.

   (**Exhibit 11**).

iii.   Cardinale's Organizational Charts, attached hereto as **Exhibit 12**, which provide that AGM owns the Alternative Numbered Entities. (*Id.* at 8).

iv.   The portion of the tax returns of AGM, attached hereto as **Exhibit 13**, which list each of the Alternative Numbered Entities as disregarded entities and reflect

AGM is the owner of the Alternative Numbered Entities.[3]

v.     AGM's consolidated financial statements, attached hereto as **Exhibit 14**, which include the Alternative Numbered Entities.

vi.    Communications with the accountant for the Alternative Global Entities, attached hereto as **Exhibit 15**, confirming (1) AGM's ownership of the Alternative Numbered Entities and disregarded entity status of the Alternative Numbered Entities; and (2) "[t]he Alternative Global Entities will also be a consolidation of sorts with all of the new companies flowing through Alternative Global Management." (*Id.*).

vii.   Cardinale's invoices for his claimed administrative services for the Alternative Global Entities, attached hereto as **Exhibit 16**, which were solely directed to and paid by AGM.

viii.  The sworn testimony of AGM Series B membership, attached hereto as **Exhibit 17**, that Cardinale represented to them that AGM was valuable because it owned the Alternative Number Entities.

ix.    Portion of Feingold deposition transcript, attached hereto as **Exhibit 18**, 337:2-9.

x.     Portion of Dazzo deposition transcript, attached hereto as **Exhibit 19**, 159:1-10.

---

[3] The Internal Revenue Service's website is clear: "If a single-member LLC does not elect to be treated as a corporation, the LLC is a 'disregarded entity,' and the LLC's activities should be reflected on its ***owner's*** federal tax return." *Single member limited liability companies*, IRS, https://www.irs.gov/businesses/small-businesses-self-employed/single-member-limited-liability-companies. The single member of the Alternative Numbered Entities is AGM, and the Alternative Numbered Entities are listed on the tax returns of AGM, their owner, as disregarded entities in accordance with the IRS's clear instruction. (*See* Ex. 13).

33.     In 2021, the relationship between Feingold and Dazzo (on the one hand) and Cardinale (on the other hand) began to fray and continued to deteriorate as the year progressed.

34.     On January 28, 2022, Feingold and Dazzo provided notice of their resignations as managers of the Alternative Number Entities and, pursuant to Section 7.3 of the Operating Agreements for the Alternative Numbered Entities and as ultimate owners of AGM, demanded their respective interests in the Alternative Numbered Entities be redeemed (the "Notice of Resignations"). The Notice of Resignations is attached hereto as **Exhibit 20** and is incorporated herein.

35.     The Notice of Resignations states:

> Mr. Feingold and Mr. Dazzo are still managers and members of Alternative Global Management LLC, hence Mr. Cardinale may not make any distributions at all from that entity without approval and consent of Mr. Feingold and Mr. Dazzo and all receipts that said entity regularly receives must continue and not be disturbed or in any manner altered without the consent of Mr. Feingold and Mr. Dazzo.

(Ex. 20, p. 2).

36.     Following Feingold and Dazzo's resignations, Cardinale became the sole manager of the Alternative Numbered Entities.

37.     As sole manager of the Alternative Numbered Entities, Cardinale still, however, owed/owes a duty of loyalty to AGM, as well as AGM's ultimate beneficiaries: Feingold and Dazzo. (*See* Exhs. 2-7, Section 11.1).

38.     Part of Cardinale's duty of loyalty as manager of the Alternative Numbered Entities is "holding as trustee for [the Company], an[y] property, profit, or benefit derived by the Manager in the conduct . . . of the Company's business." (*See id.*).

39.     The Operating Agreements for the Alternative Numbered Entities each state that "[t]he consent of all Members [here AGM] will be required to approve . . . the authorization or

ratification of acts that would otherwise violate the duty of loyalty." (Exhs. 2-7, Section 8.1(b)(4)).

40.     AGM may only act with the unanimous consent of Feingold, Dazzo and Cardinale. Thus, the consent of AGM necessarily flows through Cardinale, Feingold and Dazzo and requires their unanimous agreement.

41.     Likewise, in the event of an ambiguity, contradiction, disagreement in the vote or desires amongst the initial members of the Alternative Numbered Entities (Feingold, Dazzo and Cardinale) and any substitute members (AGM), Section 8.1(c) of the Operating Agreements for the Alternative Numbered Entities provides that the "ultimate decision shall be in the sole and absolute discretion of the unanimous consent" of the initial members of the Alternative Numbered Entities: Feingold, Dazzo and Cardinale. (Exhs. 2-7, *id.*).

42.     Soon after their resignations from the Alternative Numbered Entities, Feingold and Dazzo filed the First Filed Case. Their causes of action against Cardinale include, but are not limited to: (1) payment of fair value of their ultimate membership interests in the Alternative Numbered Entities; (2) breach of fiduciary duty as manager of the Alternative Numbered Entities; (3) conversion of the assets and funds of the Alternative Global Entities; (4) fraudulent misrepresentations relating to the Alternative Global Entities; and (5) civil conspiracy relating to the Alternative Global Entities.

43.     Cardinale, in turn, submitted himself to this Court's jurisdiction and began litigating the case aggressively.[4]

44.     On August 18, 2022, Cardinale served discovery requests on Feingold and Dazzo in which he effectively demanded Feingold and Dazzo provide an accounting of Blackstream.[5]

---

[4] Early on, however, Cardinale did concede that Feingold and Dazzo are entitled to fair value of their ultimate membership interests in the Alternative Numbered Entities.
[5] AG2, 4 and 5 transferred money to Blackstream.

45.      That same day, Cardinale subpoenaed Blackstream and Durham – who were not parties to the First Filed Case – for the same information he requested from Dazzo and Feingold. (*See* subpoena to Blackstream attached hereto as **Exhibit 21** ("Blackstream Subpoena") and subpoena to Durham attached hereto as **Exhibit 22** ("Durham Subpoena")).

46.      Feingold, Dazzo, Blackstream and  Durham all objected.

47.      On September 13, 2022, a hearing was held in the First Filed Case that did not go as Cardinale preferred. In that hearing, Cardinale's counsel mentioned Durham and Blackstream:

> 6          The role of Dazzo and Feingold was to find
> 7      the investments in which to deploy that $80 plus
> 8      million.  And that's exactly what Feingold and
> 9      Dazzo did.  They found the business enterprises.
> 10     And you are going to hear about some of those.
> 11     One of them is called Durham.  It's a home builder
> 12     based in South Carolina.  Another is a restaurant
> 13     chain, which we will talk about later.  There was
> 14     another entity called Black Stream in which monies
> 15     were invested.

(*See* hearing transcript attached hereto as **Exhibit 23**, at 12:6--15). Cardinale's counsel further represented to this Court, "we need to . . . see what Mr. Feingold and Mr. Dazzo did with [that money]. That's what this case is about." (*Id.* at 46:21-25).

48.      Despite these representations, a month later, on October 17, 2022, Cardinale circumvented the First Filed Case and improperly directed AG6 to sue Durham in New York State Court ("First Unauthorized Lawsuit Against Durham"). Critically, in the First Unauthorized Lawsuit Against Durham, Cardinale falsely represents himself, rather than AGM, to be the sole member of the Alternative Numbered Entities.

49.      The next day, on October 18, 2022, this Court granted Feingold and Dazzo's Motion for Order Concerning Timing and Sequence of Discovery Under Fed R. Civ. P. 26(d)(3),

holding that Cardinale should be deposed before the production of written discovery out of concern that Cardinale would tailor his testimony.[6]

50.     Less than two months later, Cardinale again subverted this Court's authority and falsely proclaimed himself the sole member of the Alternative Numbered Entities, this time by improperly directing AG2, AG4 and AG5 to sue Blackstream in the United States District Court for the District of South Carolina on December 13, 2022 (the "Unauthorized Lawsuit Against Blackstream").

51.     A month later, Cardinale did it again, this time improperly directing the Alternative Numbered Entities to sue Feingold and Dazzo in the Eleventh Judicial Circuit, Miami-Dade County, Florida on January 17, 2023 (the "Unauthorized Lawsuit Against Feingold and Dazzo").

52.     Later that same year, Cardinale did it yet again, this improperly directing AG6 to sue Durham in AAA Arbitration in New York on October 26, 2023 ("Second Unauthorized Lawsuit Against Durham") (collectively, the "Unauthorized Lawsuits").

53.     In each of the Unauthorized Lawsuits, Cardinale falsely represents ***himself***, rather than AGM, to be the sole member of the Alternative Numbered Entities.

54.     Cardinale has relentlessly prosecuted his Unauthorized Lawsuits, jumping from case to case depending on the ruling.

55.     Plaintiffs, in turn, have spent substantial time, effort and money defending against them. With the dissipation of the shock and awe of Cardinale's approach, the purpose of his Unauthorized Lawsuits has become clear. Cardinale's strategy is four-fold.

---

[6] In addition to the sequencing order issued by this Court against Cardinale out of concern Cardinale would tailor his testimony (ECF 233-22), another one was entered against him last month in another lawsuit involving Cardinale, Feingold and Dazzo for that same concern. (*See* sequencing  order attached as **Exhibit 24**).

56.     Through these Unauthorized Lawsuits, Cardinale seeks to: (1) subvert this Court's authority, (2) damage Plaintiffs and their reputations, (3) unjustly enrich himself, and (4) obtain the same information and documents he has been denied in the First Filed Case.

**I.     Cardinale's Unauthorized Lawsuit Against Feingold and Dazzo**

57.     Cardinale's Unauthorized Lawsuit Against Feingold and Dazzo asserts the following causes of action: (1) two counts of breach of fiduciary duty; (2) civil theft; (3) conversion; (4) replevin; (5) civil conspiracy; (6) three counts of tortious interference against Feingold and Dazzo; (7) accounting; and (8) unjust enrichment.

58.     In that action, Cardinale wrongfully claims he is the sole member of the Alternative Numbered Entities and wrongfully "seeks significant damages and related relief against Feingold and Dazzo arising out of their theft of corporate books and records identifying, among other things, the nature and status of investments totaling in excess of $81 Million that they managed as the then co-managing members of the Alternative Global Companies."

59.     Cardinale further wrongfully alleges that Feingold and Dazzo obstructed and interfered with alleged payments owed from Blackstream.

60.     Additionally, as he did in the First Filed Case, Cardinale served document requests on Feingold and Dazzo seeking an accounting for Blackstream and Durham.

**II.     Cardinale's Unauthorized Lawsuit Against Blackstream**

61.     Through the Unauthorized Lawsuit Against Blackstream, Cardinale seeks millions of dollars in damages against Blackstream.

62.     To be clear, for the $17,561,300 transferred from AG2, 4 and 5 to Blackstream, Cardinale is seeking recovery in the Unauthorized Lawsuit Against Feingold and Dazzo *and* in the Unauthorized Lawsuit Against Blackstream.

63.     Cardinale asserts claims against Blackstream for breach of fiduciary duty and an accounting, both predicated on the existence of a fictional joint venture between the parties.[7]

64.     The record in the First Filed Case confirms Cardinale knows the Unauthorized Lawsuit Against Blackstream is frivolous and subverts this Court's authority. Indeed, counsel for Cardinale and AG2, 4 and 5 concede that the core issue in Cardinale's Unauthorized Lawsuit Against Blackstream is being litigated in the First Filed Case: "the essential issue in the situation in the [First Filed] case and the essential problem, the thread running through all of these motions is Feingold and Dazzo directed the money to go to Blackstream Development, LLC."

65.     Cardinale and AG2, 4 and 5's counsel also represented that discovery in the First Filed Case is needed, regarding the flow of funds to and from Blackstream, so that Cardinale can determine the value of AG 2, 4 and 5.

66.     Cardinale knows the issues surrounding the transfer of funds to Blackstream fall within the First Filed Case.

67.     Still, he continues to subvert this Court's authority to wrongfully damage Blackstream and to seek the same discovery he sought through the Blackstream Subpoena in the First Filed Case, which was quashed by this Court's Order on November 1, 2023. (ECF 168).[8]

68.     The month after this Court quashed the Blackstream Subpoena in the First Filed Case, Cardinale served written discovery requests on Blackstream in his Unauthorized Lawsuit

---

[7] Cardinale filed the Unauthorized Lawsuit Against Blackstream over 19 months ago. Yet, Cardinale has failed to produce any written agreement to support his contrived joint venture allegations regarding Blackstream in response to the single request for production Blackstream served. Nor can he, because no such agreement exists.

[8] In that Order, this Court found (1) Cardinale failed to show a direct relationship between the AG companies and Blackstream; (2) Cardinale already had access to many of the documents sought; and (3) Cardinale admits that prior to January 28, 2022 (when Feingold and Dazzo resigned and demanded fair value) "that Cardinale had routinely received information to the investments." (ECF 168).

Against Blackstream seeking identical information and documents (the "Blackstream Discovery Requests").

69.     Blackstream thus objected to the discovery requests, citing directly to this Court's November 1, 2023 Order.

70.     In response, Cardinale improperly directed AG2, 4 and 5 to file a motion to compel.

71.     He also served a subpoena on Blackstream's bank (Southern First), seeking the same information sought first by the Blackstream Subpoena and then by the Blackstream Discovery Requests.

72.     On February 26, 2024, Blackstream moved to quash the subpoena to Southern First and sought a protective order, citing directly to this Court's November 1, 2023 Order.

73.     That same day, Blackstream moved to transfer Cardinale's Unauthorized Lawsuit Against Blackstream from the South Carolina District to this District pursuant to 28 U.S.C. § 1404(a), based on its common thread with the First Filed Case, *i.e.*, the dispute between Feingold and Dazzo (on one hand) and Cardinale (on the other) regarding the flow of money to and from Blackstream from AG2, 4 & 5.

74.     Cardinale, of course, opposed the motion to transfer. He lost.[9]

75.     After Cardinale's Unauthorized Lawsuit Against Blackstream was transferred to this District, this Court *sua sponte* consolidated it with the First Filed Case.

76.     Despite such rulings being entered, Cardinale continues to seek millions of dollars

---

[9] In granting Blackstream's Motion to Transfer, the South Carolina District Court found, *inter alia*, that: (1) the arguments made in the First Filed Case likely overlap with arguments to be presented in the Unauthorized Lawsuit Against Blackstream; (2) AG2, 4 & 5's arguments that the cases were dissimilar, in terms of the named parties and the alleged respective measure of damages, were not persuasive (citing the prior sworn declarations of Cardinale); and (3) the Unauthorized Lawsuit Against Blackstream appeared to be subsumed by the First Filed Case.

in damages against Blackstream and to harass it, as well as its bank.[10]

### III.    Cardinale's Unauthorized Lawsuits Against Durham

77.    Cardinale filed the First Unauthorized Lawsuit Against Durham in the New York Supreme Court in October 2022. (*See* Verified Complaint, attached as **Exhibit 25**).

78.    In this action, Cardinale alleges $5,995,000 was loaned to Durham pursuant to a Note, Durham breached the Note, and Durham is obligated to pay in excess of $7.2 million in damages. (*See id.*).

79.    A year later, Cardinale filed the Second Unauthorized Lawsuit Against Durham in AAA Arbitration. (*See* Complaint, attached as **Exhibit 26**). In that case, Cardinale characterizes the ***same $5,995,000*** as an investment pursuant to a Joint Venture Agreement. (*See id.*). He then claims Durham breached that agreement, and seeks an award of 50% of Durham's profits, if any. (*See id.*).

80.    Through the Unauthorized Lawsuits Against Durham, Cardinale is seeking to recover from Durham ***twice*** on the ***same money***.

81.    While Cardinale lists only Durham as the adversary in the caption of his complaint, his real targets are in the fine print of it: Feingold and Dazzo. (*Id.*, ¶ 34 n. 5).[11]

82.    Cardinale's vexatious litigation ultimately pushed Durham into Chapter 11 bankruptcy, which automatically stayed the Unauthorized Lawsuits Against Durham. Cardinale,

---

[10] The Unauthorized Lawsuit Against Blackstream is pending before this Court. In each of the Unauthorized Lawsuits, the respective defendants, now united here as Plaintiffs, are defending themselves not only from the substantial, albeit baseless, allegations but also from the vexatious litigation tactics and discovery abuses of Cardinale. Nevertheless, Cardinale's unwavering and improper attacks compound daily. To promote judicial economy, Plaintiffs have joined together to bring a single cause of action seeking to end the Unauthorized Lawsuits.

[11] In addition, Cardinale and AG6's counsel recently sent a letter to the AAA Tribunal referring to Feingold as the "kingpin," a "Durham Insider," and one of "the real parties of interest" in the case against Durham. Said letter is attached as **Exhibit 27**.

of course, directed – without authorization – AG6 to file a motion to lift the stay of the Second Unauthorized Lawsuit Against Durham. Just last week, that motion was granted by the bankruptcy court.

83.     Thus, for the $5,995,000 transferred from AG6 to Durham, Cardinale continues to seek recovery from Dazzo and Feingold in the Unauthorized Lawsuit Against Feingold and Dazzo *and **double recovery*** from Durham in the Unauthorized Lawsuits Against Durham.

84.     In addition to seeking a global and unauthorized triple-recovery outside of this Court, Cardinale has been relentless in his pursuit of the same documents and information he sought with the Durham Subpoena issued in the First Filed Case. His requests to Durham are attached as **Exhibit 28**. (*See id.; compare with* Ex. 22).

85.     Moreover, he seeks to subpoena documents from Feingold and Dazzo in the AAA arbitration. In classic Cardinale fashion, each unauthorized subpoena contains 21 requests and seeks everything imaginable to him from July 2020 to the present. (*See* subpoenas attached hereto as **Exhibits 29 and 30**).

86.     Feingold and Dazzo (and therefore AGM) have not and do not consent to Cardinale's Unauthorized Lawsuits.

87.     Cardinale's Unauthorized Lawsuits have caused injury to each of the Plaintiffs and will cause further injury to the Plaintiffs in the future.

88.     Cardinale's damaging campaign of harassment against Plaintiffs violates the Operating Agreements of the Alternative Numbered Entities and subverts this Court's authority. Cardinale should be restrained from further prosecution pending a final ruling in this matter.

89.     All conditions precedent to bringing this action have been satisfied, waived or rendered unnecessary due to futility.

**FACTUAL ALLEGATIONS SUPPORTING FEINGOLD AND DAZZO'S ADDITIONAL CLAIMS AGAINST CARDINALE AND CLAIMS AGAINST VANIA, RVCNY, AND RVCSI**

90.     In addition to the facts set forth in paragraphs 17 through 88, these claims involve the actions of Cardinale hiding over twelve million dollars of compensation from his investors in the L3 Capital Income Fund – in which he is the sole fund manager – as well as Cardinale's fraudulent billings to Feingold and Dazzo for services that Cardinale never performed and for which Cardinale has been claiming a lack of knowledge of substantially all businesses operations even though he was the highest compensated person with the responsibilities of manager, paid advisor, equity owner, fiduciary and paid consultant. Prior to providing testimony in this case, Cardinale has claimed, after many questions raised by his investors, that he has a complete lack of knowledge of not just the business operations but also no possession of critical business records for all businesses which he oversaw and was paid to oversee. Now Cardinale claims in testimony in this case that it was not his primary job or responsibility to oversee business operations, not his job to maintain the books and records and further admitted that he does not have the complete books and records that he was paid to keep and maintain. More than that, Cardinale has now further testified that he lacks an understanding of basic business and financial terms of common usage and that multiple representations that Cardinale made to his investors and to induce Feingold and Dazzo are materially false and misleading.

91.     Since the filing of Dazzo and Feingold's original complaint in the First Filed Case, numerous others have attested to Cardinale's frauds and wrongdoings. Close friends and prior business associates have detailed Cardinale's misconduct in lawsuits against him and otherwise, including Cardinale's decades-long frauds on investors pertaining to his supposed successful investment track record. 26 of Cardinale's L3 investors have sued him for investment frauds in

three separate cases.[12] Another L3 investor recently filed another case, an arbitration wherein the investor alleges that **"[s]adly, the Claimant is the victim of a fraudulent investment scheme, referred to herein as 'L3,' perpetrated by . . . Richard Cardinale."** (emphasis added).

92.     Cardinale has been unable to substantiate many of his false representations made to Feingold and Dazzo and also to his L3 investors (described herein below). For instance, Cardinale's private placement memorandum for the L3 Capital Income Fund refers to Cardinale's supposed ten-year track record of obtaining between twelve (12%) to fifteen (15%) percent returns, but when questioned about this during a recent deposition he claimed he could not remember the details of those supposed investments. *See* excerpts of Cardinale's deposition, attached as **Exhibit 31**.[13]

93.     Cardinale, nonetheless, falsely claims to have a "sterling reputation" by, among other things, trying to distance himself from certain "boiler room" investment firms where he was employed where owners of said firms were convicted of crimes, falsely claiming he has never had any customer complaints, and falsely claiming he was only a "passive" owner of a company (Richmond Capital Group n/k/a RCG Advances) – which the Federal Trade Commission and New York Attorney General charged with abusing and threatening physical violence against consumers

---

[12] *William J. Moroney, As Trustee of the WJM Trust, et al. v. Richard Cardinale, et al.*, Index No. 653999/2023 (Sup. Ct. NY Cty); *Anthony Siriani, et al. v. Richard Cardinale, et al.*, AAA Case No. 01-23-0004-1570; and *KH Capital, LLC v. Richard Cardinale*, et al., Case 1:23-cv-10099-LAK-RFT (SDNY).

[13] **14· · · · Q· · So you made a passive investment, you are**
**15· ·saying, in a nontraditional finance industry company**
**16· ·that generated 12 to 15 percent, but you don't**
**17· ·recall the name?**
18· · · · A· · I have done many businesses in my life; I
19· ·can get you the information, it's not a problem.
20· ·**But I absolutely don't know the answer to your**
21· ·**question.**

when banking records show that Cardinale and another co-owner – his best friend, long-time business partner and reputed member of the Gambino organized crime family (Robert L. Giardina) – made the same amount of money through the venture.[14]

94.     Cardinale's response tactic to any opposition to his lies and deceit, is threats, intimidation and/or lawsuits. For instance, Cardinale's L3 investors have asserted that Cardinale has threatened his L3 investors that if any of them sue him they will never see a dime or he will exclude them from any settlement.  Other L3 investors have been supplied with template affidavits *prepared by Cardinale's own lawyers* undoubtedly signed under duress of threats, which include a continuation of Cardinale's false narrative and have been filed in this and other courts. Even before the L3 investor lawsuits were filed 70% of the L3 Capital Income Fund sought to redeem and thereby disassociate from Cardinale.

95.     Cardinale was paid a massive amount of money in his various roles as manager, paid advisor, equity owner, fiduciary and paid consultant, including $1.6 million in administrative fees, $620,000 in "advisory" fees for his advising the transactions completion, $1.598 million in acquisition fees to oversee and paper all of the acquisitions, and management fees of approximately $410,000 to manage the transactions once completed, and additional payments of $2,987,000, $3,263,055.05 and $1,935,000.  All told, Cardinale was paid nearly $12 million for this and with all of the fees and benefits to Cardinale and his family, a total of about $14 million. Cardinale, however, seeks to avoid his lies and contradictions by spinning an impossible tale that his job was simply to raise capital and that he really does not have the expertise he was paid for and cannot

---

[14] The company and Giardina would settle with the FTC in June 2022. https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-action-results-ban-richmond-capital-owner-merchant-cash-advance-debt-collection-industries. The NYAG obtained a $77 million judgment against the company, Giardina and others in February 2024.     https://ag.ny.gov/press-release/2024/attorney-general-james-announces-historic-judgment-against-predatory-lender

now even speculate on the meaning of basic business terms like "advisory fees" or "compensation." He now falsely claims that Feingold and/or Dazzo were in charge of everything and that Feingold was their lawyer even though a large law firm, Sheppard Mullin, served as counsel as reflected in the various offering materials. Neither Feingold nor Dazzo were paid administrative, advisory or acquisition fees.

96.     These contradictions and stories have not gone unnoticed by this Court, which sequenced Cardinale's deposition to take place before other discovery for fears of him tailoring his testimony. More recently, a Florida State Court, Judge Thomas J. Rebull, likewise sequenced Cardinale's deposition before other discovery. (*See* Ex. 24).

97.     In addition, Cardinale continues to loot a merchant cash advance portfolio known as "Alternative Spin." This portfolio was agreed to be shared equally among Feingold, Dazzo and Cardinale, but Cardinale has frozen out Feingold and Dazzo and Cardinale continues to make substantial unauthorized withdrawals.

98.     With respect to another merchant cash portfolio also controlled by Cardinale with monies loaned from Alternative Global One, an AAA emergency arbitrator has restrained Cardinale based upon substantial evidence that "Cardinale has improperly seized control over AGM, blocked Feingold and Dazzo from AGM's business and assets, and misappropriated or lost over $25 million from Alternative Global One, LLC."

99.     The key facts begin on or about the first week of July 2019 when, after numerous prior discussions, Cardinale asked Feingold and Dazzo to be co-managers of his investment fund he was forming, the L3 Capital Income Fund. Both Feingold and Dazzo rejected the proposal. Feingold and Dazzo told Cardinale they had no desire to be fund managers, that their offices were not set up to service and administer a fund of retail investors, and that they had several outside

businesses that would not allow them to devote the time necessary to be a fund manager and operate a fund.

100.    Cardinale responded that he had operated nearly ten funds himself and already had a complete back office set up to operate a fund. Cardinale told Feingold and Dazzo he employed two administrative workers and one in-house attorney, and that he would provide all record keeping, reporting, due diligence, compliance and complete back-office services so both Feingold and Dazzo would not have to be responsible for any administrative services.  Feingold and Dazzo still rejected the proposal.

101.    In addition, Cardinale said that he had an advisory company, L3 Capital Advisors — a registered investment advisor ("RIA"). Cardinale also said that he was familiar with all legal requirements as his RIA held him to a higher standard and therefore, he was qualified to handle the services discussed. Feingold and Dazzo again advised Cardinale that they still were not interested in being managers of a fund.

102.    Feingold and Dazzo conveyed that they were only looking for a source of non-recourse funding to pursue various businesses they were pursuing, including merchant cash advance and real estate. They advised Cardinale they could have their various businesses borrow money from Cardinale's fund, the L3 Capital Income Fund, and that they would pay above market interest rates if the money was loaned to them non-recourse and unsecured but they only wanted to find a lender, they were not interested in being fund managers and had never previously acted as fund managers and did not feel comfortable with such responsibilities or the back office and record keeping requirements and thereby Feingold and Dazzo rejected any proposal involving responsibility for the L3 Capital Income Fund.  Feingold and Dazzo were simply seeking a source of funding for the businesses that they wanted to pursue and were simply looking for a lender.

103.     Cardinale said he would agree to have his fund, the L3 Capital Income Fund, be a lender to Feingold and Dazzo's intended business endeavors if he was made an equal equity owner in any borrowing business entity and could earn money from any monies generated from the borrowing business entities. These business entities eventually became the Alternative Numbered Entities, which are owned by AGM. Cardinale, Feingold and Dazzo are the ultimate managing members of AGM.

104.     Feingold and Dazzo agreed to allow Cardinale as an equal member in the Alternative Global Entities if, and only if: (a) Cardinale disclosed all conflicts of interest and compensation, including but not limited to fees, distributions or any other monies he would receive from the Alternative Global Entities, to his L3 clients; and (b) the L3 Capital Income Fund's back office administrative services, which included the entire staff of the L3 Capital Income Fund would provide all record keeping, reporting, due diligence, compliance and complete back-office services and support for the Alternative Global Entities. This was all to be billed as administrative expenses.

105.     Cardinale said that he would have himself and his entire back office provide such services for the Alternative Global Entities if the Alternative Global Entities paid all the administrative expenses of both the L3 Capital Income Fund and the Alternative Global Entities since the same staff would serve both and Cardinale had already gone through the time and expense and had the experience of running complete back-office services. Hence, the Alternative Global Entities would pay all administrative expenses for themselves and the L3 Capital Income Fund in return for all of the back office, record keeping, due diligence, and compliance (which all were collectively referred to as the administrative expenses) which were to be provided in one spot, which was at the office location of Cardinale for not only the Alternative Global Entities but also the L3 Capital Income Fund.

106.    This deal was beneficial for Feingold and Dazzo as they did not have to worry about any of the aforementioned administrative services for the Alternative Global Entities and this deal was also beneficial for Cardinale as all administrative services were paid for by the Alternative Global Entities with regards to Cardinale's operation of the L3 Capital Income Fund, the entity which he was the sole fund manager responsible to all of his retail investors. Therefore, Feingold and Dazzo would not have to worry about any administrative services, and Cardinale would not have to worry about paying the administrative expenses for L3 Capital Income Fund.

107.    Cardinale also represented to Feingold and Dazzo that he would handle all conflict of interest, earnings, distribution and fee disclosures as he was personally responsible for and had a fiduciary duty for such disclosures anyway since he operated an RIA. (*See* **Exhibit 32**, p. 6). Thus, under law as an RIA, Cardinale was a fiduciary and would have to make all conflict-of-interest disclosures and complete and detailed compensation disclosures anyway and the requirements of Feingold and Dazzo regarding disclosure would be met.

108.    Cardinale also demanded to be paid an advisory services fee through his RIA, L3 Capital Advisors, as he claimed he had the most real estate and financial experience, and would oversee everything and provide what he described as his superior skills.

109.    Cardinale boasted about his investment return history of 12-15% as well as his prior business endeavors throughout his business career. Cardinale repeated these lofty returns in the private placement memorandum he circulated for potential investors in the L3 Capital Income Fund and to Feingold and Dazzo. However, recently when Cardinale was confronted and forced to disclose the source of the prior history of the returns, he was unable to articulate such sources.

110.    Cardinale made other representations in order to induce Feingold and Dazzo to do business with him, including that: (1) he was a successful developer and largest developer in

Leesburg, Florida and was making millions; (2) he built 20 apartment buildings in New York; (3) he successfully developed a high-priced condo; (4) he had an unblemished record in finance and real estate; (5) he had a gold fund where people made six times their money and it was going public; (6) he raised over $30 million for a company called Graphoid where all investors made money and that company was going public; (7) he produced a successful motion picture; (8) he successfully ran multiple debt settlement companies; (9) he made significant returns in the payday lending business with Sky Capital; (10) he had a successful sports bar operation in Leesburg, Florida; (11) he had a high-end, successful coffee shop in New York; (12) he was opening tattoo parlors and acquired the equipment; (13) he had a successful scrap metal operation in Brazil; (14) he was a successful international developer including successful development of townhomes in Brazil; and (15) in 2006 he made so much money as a real estate developer that he could retire and was only working because he enjoyed training young people.

111.     As Feingold and Dazzo would later learn, these representations were false and could not be substantiated by Cardinale. These representations were made to induce Feingold and Dazzo to do business with Cardinale and continuously repeated to have Feingold and Dazzo continue to do business with Cardinale and consent to additional advisory fees and acquisition fees which only Cardinale received and for which Cardinale was paid millions and for which he conveniently and intentionally failed to in detail itemize to his investors that he made in excess of twelve million dollars off of his investors.

112.     Cardinale now had a multitude of roles and conflicts and sources of income as he now acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund ("Fund Manager"), (2) an owner and manager of AGM, (3) manager of the Alternative Numbered Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to

provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise. Thus, Cardinale had multiple sources of earnings, which had to be disclosed in detail to his investors with the complete detail enumerating the exact amounts he was being paid. In fact, Cardinale has never given such enumerated detail but rather now hides his enormous pay under the guise of following legal advice even though Cardinale operated nearly ten prior investment funds and is a fiduciary and certainly knows that he must give completely detailed disclosure to his investors.

113.   Over the first two and a half years, Cardinale billed AGM about $1.6 million dollars. Feingold and Dazzo paid these amounts believing they were paying for all administrative expenses and Cardinale's continued promises that he had maintained all the records, reporting, due diligence, and complete back-office services for the Alternative Global Entities.

114.   Those promises were false. Still, Cardinale submitted monthly invoices and never once advised either Feingold or Dazzo that the services, which were being paid for every month, were not being done. (*See* Ex. 16 (voluminous bills submitted by Cardinale totaling over $1.3 million have been attached)). Cardinale has now further confirmed that his promises were false, claiming that it was not his job to maintain all of the books and records for the Alternative Global Entities that he was paid to keep and maintain. Cardinale has testified that he received $1.6 million in administrative services payments but that his records are not complete and that even with the large sums of money that he received to keep all of the records, he claims to his investors that he cannot pay them because he does not have all records necessary yet he still issues them K-1s, and audited financials but when it comes to operating the businesses or paying his investors, Cardinale claims he is unable to make the payments because he does not have complete records.

115.     Even worse, after a review of the now detailed "administrative expenses" Cardinale sought reimbursement for, it becomes clear Cardinale was just billing Feingold and Dazzo in order to live the high life with fancy dinners and other extravagant perks.

116.     Cardinale and only Cardinale is mentioned as the sole Fund Manager of his investor's funds (since he is) and his private placement memorandum lists the Fund Manager as the person with the sole and absolute discretion overseeing the investments, making the investments, operating the investments and performing all diligence on the investments. In fact, Cardinale's private placement memorandum makes reference to the Fund Manager (Cardinale) over 100 times with the risk factors specifying that Cardinale is the sole person responsible for all investment decisions and operation of the investments. Cardinale was absolutely required to have complete records not only to comply with his paid obligations from Feingold and Dazzo, but also his lawful obligations to his investors as per the private placement memorandum.

117.     In some months, the bills Cardinale submitted to Feingold and Dazzo for administrative expenses exceeded one hundred thousand dollars and included charges from Cardinale's American Express "Black Card" where he was billing for travel and meals, all which he claimed were for the business and necessary as part of his due diligence and advisory and administrative services. Software related charges and office supply charges were also billed. Cardinale said these items were being billed because he was taking care of all the administrative services. Further, all Cardinale's employees' salaries and benefits were paid by the Alternative Global Entities, with the understanding and belief they were supplying the complete back-office services for those entities since neither Feingold nor Dazzo had any employees.

118.     All told, Cardinale received about $1.6 million for administrative services and an additional $620,000 in "advisory" fees and additional acquisition and management fees under Feingold and Dazzo's reasonable belief that Cardinale was providing what he had promised.

119.     For nearly two years, Feingold and Dazzo operated under the false assumption that $1.6 million paid to Cardinale was for legitimate business expenses to support the back-office operations of the Alternative Global Entities. Upon information and belief, Cardinale fraudulently billed the Alternative Global Entities. For instance, travel and entertainment expenses were not for due diligence or advisory purposes, ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████

120.     ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████     Further, the Alternative Global Entities paid for office space that had apparently been closed at some point. Cardinale operates out of a UPS storefront or a bagel store and there is no actual physical office in an office building.

121.     In all, Cardinale billed about $1.6 million for expenses but he now claims to only have some, incomplete back-office records and due diligence files (while previously claiming he had none) and that the substantial monies paid were not used as represented. Cardinale has also stated that he brought a lawsuit in Delaware Chancery Court for the books and records at issue "[b]ecause I don't have all of the books and records." Further, Cardinale's incredible view of due diligence files now seemingly includes texts, Skypes, certain PowerPoints and his own quarterly

reports to investors, which can hardly be considered the proper due diligence files for the Alternative Global Entities.

122.     At some points, Cardinale even falsely represented to this Court that Feingold and Dazzo stole Cardinale's computers from his offices in New York as well as Cardinale's QuickBooks. At other times, he has avoided making such preposterous claims thus showing that Cardinale changes his claims about his records from not having any records (when he wants to avoid paying his investors) to having some records (in order to avoid a situation where he is an investment manager breaching his ability to perform for his investors) to having his computers stolen and saying so in open court here in order to try to sway this Court.

123.     In addition, Feingold and Dazzo now believe that Cardinale did not disclose millions of dollars in earnings and distributions he made from the Alternative Global Entities to his fund clients although he claimed that he would make such disclosures. In fact, Cardinale now claims he was not required to disclose distributions from the Alternative Global Entities because they are not fees or compensation. As a fiduciary, Cardinale had to specifically itemize and disclose to his investors the actual monies, including distributions, he made, but he never did so. There is no record of Cardinale giving his investors any itemized disclosures as he hid the amounts he made from his investors. Cardinale intentionally omitted to disclose to his fund clients what he was making even though he had to do so, not only because he was a fiduciary but also for conflict-of-interest purposes. He also agreed to do so in the private placement memorandum for the L3 Capital Income Fund and represented to Feingold and Dazzo that he would do so.  In fact, Cardinale could not now even say that he itemized all earnings quarterly for the investors of the L3 Capital Income Fund rather in his deposition here Cardinale feigned an inability to understand

and could not speculate as to what simple words such as definitions of types of "fees" meant even though his own private placement memorandum used those exact words.

124.    Not only does Cardinale now claim he is unable to describe the simple terms such as fees and compensation, he also claims confusion and reliance upon others in determining what to disclose when the plain fact is that he is a fund manager spanning at least ten funds as well as owning an RIA and he knows that he must give complete detail to his investors of what he earned and not fake that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," which he stated in his deposition here that he could not speculate on the meaning of such terms.

125.    Cardinale charged and earned what is estimated to be in excess of $12 million from the Alternative Global Entities, L3 Capital Advisors for advisory services billed to the Alternative Global Entities, and additional compensation he took, such as in relation to debt settlement in Alternative Global Three LLC. That undisclosed compensation related to debt settlement alone equated to approximately $2 million. In addition, further undisclosed monies were paid to L3 Capital Management.

126.    There were over ten sources of earnings which would have required detailed disclosures to his investors, which Cardinale did not make. This was intentionally not disclosed by Cardinale who represented Feingold and Dazzo that as a fiduciary he knew what he was supposed to disclose. Yet he intentionally failed to do so.  Now Cardinale claims it was not his job to keep records and he cannot speculate on what "compensation" means and he further claims reliance on others when he was supposedly the most skilled and experienced and highly compensated person due to his expertise. Now he is disclaiming all expertise and even disclaiming

an understanding of simple finance terms that a seasoned fund manager making more than twelve million dollars should know.

127.   Upon further information and belief, for certain investments, Cardinale has had family members and friends paid and returned capital ahead of other non-family member investors thereby showing improper preferences. Thus, upon information and belief, Scott Pinto falls into this category, and ████████████████████████████████████████ ████████████████████████████████ These preferences have been echoed by L3 investors who are suing Cardinale.

128.   During the nearly two years of Feingold and Dazzo working with Cardinale, sometimes other persons in the financial community told stories of Cardinale's multiple misdeeds and acts of dishonesty including, but not limited to, falsification of investment success, falsification of deal performance, and arguing with colleagues.

129.   Finally, by the end of 2021, Feingold and Dazzo realized that working with Cardinale was unwise. Even though Feingold and Dazzo were simply involved as borrowers from Cardinale's web of entities, it simply did not make sense to continue with a person who appeared to lie even while being caught in many contradictions. There was simply too much drama and too many people that had reasons to not like Cardinale and too many inconsistencies in his stories.

130.   At first, Feingold approached Cardinale to discuss his concerns. Cardinale responded by referring to everyone else as being liars and jealous of him because he was building a nearly $7 million home, had a multi-million-dollar beach house and a multi-million-dollar farm, and many luxury cars. In December of 2021, Cardinale traveled to Greenville, South Carolina for a group dinner and so many persons at the dinner ignored him due to their own issues with him that Cardinale claimed that he wanted to hold another meeting to cross examine nearly a dozen

people who did not want to do business with him to prove their belief that he was dishonest and untrustworthy was really all about their jealousy of him and the enormous business success he claimed to have achieved and all of the assets he accumulated. Cardinale could not accept the fact that so many people had tired of his lies and deceit and simply wanted nothing to do with him anymore.

131.    Cardinale's explanations were not acceptable, and matters came to a head in January 2022, when Feingold sent a rather terse communication to Cardinale, ceasing all relations. (*See* **Exhibit 33)**.

132.    Later on January 28, 2022, both Feingold and Dazzo provided the Notice of Resignations to Cardinale. (*See* Ex. 20).

133.    Thereafter, on February 5, 2022, Feingold and Dazzo commenced the First Filed Case.

134.    ***After*** Feingold and Dazzo sued Cardinale in this Court, Cardinale sued Feingold and Dazzo in Delaware Court of Chancery seeking the same books and records he was paid to keep and maintain. In fact, Feingold and Dazzo are aware that since that time Cardinale has approached multiple persons for books and records that he promised he would keep and he was paid to keep in an effort to stuff his files to be able to say he complied with his representations to Feingold and Dazzo.

135.    For over two years, Feingold and Dazzo had Cardinale paid for all administrative expenses only to learn that Cardinale had claimed to have no records. That statement shows that Cardinale not only took monies for administrative services he did not perform, but also shows that Cardinale may have been claiming that he does not have records to avoid answering his investors' concerns.

136.    Cardinale apparently represented to his investors that they could expect to receive over 27% per year in returns (interest and profit distributions). When his income fund did not pay such returns, Cardinale, who is and has always been the sole Fund Manager, responded that he does not have the records so he cannot explain why the returns to some of his income investors have been lower than expected. As described, Cardinale has since testified in this case that it was not his job to keep those records, which is utterly false. Cardinale now claims he has *some* records, yet at times also claims that his computers were stolen and that his QuickBooks were stolen and that, thereby, he had no records. Cardinale keeps changing his story depending on his audience.

137.    When Cardinale could not meet the returns he told some of his investors that he, as sole Fund Manager, was ignorant of and lacked possession or knowledge of records. However, by taking such a baseless stance, Cardinale has at a minimum admitted that he is not a fit Fund Manager. A person should not be permitted to manage a fund if they have no records and no proper due diligence files. Yet in an act of desperation, that is apparently the position Cardinale has been taking to avoid his investor's questions. Before his investors questioned him, Cardinale did not make up excuses for not having records for over two years and before Feingold and Dazzo raised their concerns, Cardinale continued to take all his monies and represent to others his key leadership role in all businesses and all decisions. Cardinale had consistent monthly payments to his L3 Capital Management entity for billed administrative expenses, and his billings to the entities for "advisory services" to oversee everything were always paid, and now miraculously he only complained about lack of knowledge and records **after** being confronted about his multiple dishonest acts and inability to answer his investors about promised returns to his investors in his fund which he is the sole Fund Manager. Cardinale was also paid acquisition fees in the businesses due to his professed incredible business skills. Yet now he claims difficulty in running the

businesses and *even claims difficulty in remembering if he got a business degree in college because it was so long ago that he cannot remember.*

138.     During the two years in which Cardinale received monies from the Alternative Global Entities, he never once claimed that he did not have records nor that he did not have due diligence.  Rather, he not only kept receiving those monthly payments for expenses, but he also continued to bill an advisory fee claiming that he was providing advisory services overseeing the businesses under his many advisory contracts. (*See* **Exhibit 34** (advisory agreements that Cardinale had executed)).  In fact, Cardinale was also paid approximately $620,000 in advisory fees. He also billed acquisition fees to his fund again as a result of his professed business expertise and experience.

139.     Once they became aware, Feingold and Dazzo complained and questioned Cardinale about these advisory services.  Feingold and Dazzo have now learned that Cardinale, at other businesses and funds which he has operated, has employed a similar tactic of lack of knowledge, lack of records, and lack of understanding. For instance, Cardinale ran/runs a gold fund where he advised certain investors they had made six times their money and that the fund was guaranteed to become publicly traded. But when no such public offering happened as represented, and no such returns were experienced, Cardinale told investors that his long-time friend and business partner Robert L. Giardina is running the gold fund for him and that they should address their gold fund questions to Giardina. Cardinale has taken the same tactic here, claiming that he has no knowledge of yet again another fund where he is the manager.

140.     Cardinale, when confronted at his deposition in this case about the advisory fees paid, and despite representing to Feingold and Dazzo that he had been providing advisory services overseeing the businesses under his multiple advisory contracts, incredulously claimed that he was

being paid under those agreements he signed not for advisory services (as the contracts state and he represented), but for purported "administrative expenses" and he refused to speculate on the meaning of "advisory." Yet again, Cardinale's promises and representations were false.

141.     It was not until **after** Feingold and Dazzo put Cardinale on notice of the complaints against him and **after** Feingold and Dazzo's Notice of Resignations, that Cardinale, who is the sole Fund Manager of the L3 Capital Income Fund and the sole Manager of the Alternative Numbered Entities, miraculously claimed not only that he has no records but Cardinale also claimed he is unaware of business operations, and he cannot in detail explain the business to anyone even though he was the most highly compensated person with a full office and staff and multiple entities that he received earnings and compensation for his alleged expertise. Also, Cardinale participated in what is estimated to be more than one hundred conference calls on the businesses with Feingold and Dazzo and yet his claimed ignorance serves him well in avoiding questions by his investors and avoiding payment of large amounts of fair value admittedly owed to Feingold and Dazzo.

142.     Cardinale takes the position that Feingold and Dazzo know about all of his L3 business even though Feingold and Dazzo are not even mentioned once in the private placement memorandum. Cardinale, as Fund Manager, is mentioned more than 100 times. Feingold and Dazzo were/are only member managers of the Alternative Global Entities and had none of the legal obligations which Cardinale had and for which he had professed no knowledge or records of to avoid the serious inquiries of his investors and now multiple investor lawsuits for investment frauds.

143.     Cardinale's claims of prior outsized investment returns (12-15%) have now also been revealed false, as well. Cardinale now cannot substantiate these alleged prior investment

returns. Cardinale made these false representations to induce potential investors to invest in the L3 Capital Income Fund. Cardinale also made these false representations to induce Feingold and Dazzo to do business with him as he circulated the draft private placement memorandum of L3 Capital Income Fund to Feingold and Dazzo, and Cardinale actively assisted in drafting the private placement memorandum but at no point did he remove his false investment history as he used that fake history of success as a way to keep Feingold and Dazzo doing business with him as well as his investors. At the time, Feingold and Dazzo were not aware that these material representations were false.[15]

144.   Even more disturbing, in or about, May 2022, Cardinale learned that one of his business partners in the debt settlement, who had not signed a noncompete agreement, had left his business relationship with Cardinale to pursue another business endeavor. Cardinale apparently called this person impliedly threatening that something might happen to that person and which would be out of the control of Cardinale. Cardinale thus implied that something would happen, an old-style gangster move of claiming that Cardinale would not be responsible for any unexplained events that happened to the person. Shortly thereafter (within approximately one week), a group of people (including Giardina) showed up to the gated home of the person to harm and intimidate him, admitting that they intended to physically beat him up. (*See* **Exhibit 35** (putting Cardinale on notice that the threat of physical violence has required the complete separation from Cardinale and that no further communications will be permitted)).

145.   This issue of violence is of such concern that a police report was made with the Boca Raton police department under case number 22-6838 by the victim who is not a party to this

---

[15] In this litigation, Cardinale now describes himself as merely a "passive" investor in real estate and, more recently, claims to have never managed a merchant cash advance portfolio.

litigation (but a potential witness). There is also video and photos of the would-be attackers standing outside the person's home.

146.    Cardinale was put on notice via email from the victim about the attempted attack. After receiving the email, Cardinale did not respond with shock or disgust as to what happened to the victim (a normal response by someone not involved) but simply ignored the email as if to send the message he knew what happened and was condoning such conduct by his silence to the events. (*See* email of the victim of Cardinale, attached as **Exhibit 36**). The victim directly emailed Cardinale about the outrageousness of sending attackers to his home to which Cardinale simply remained silent but later and likely after learning the police were involved, then claimed that he had no control over what his long-time business partner and close friend Giardina had done.

147.    Because of the above, Feingold emailed to Cardinale advising him intimidation as a business tactic cannot be tolerated and used by Cardinale as a tool to achieve his desired goals and that no further contact would be continued with Cardinale. (*See* Feingold's email about intimidation attached as **Exhibit 37**).

148.    Moreover, it has only now been revealed during Cardinale's testimony in this case that Giardina has been an owner of L3 Capital Advisors, but Cardinale did not disclose this to Feingold and Dazzo at the time and there is no mention of Giardina being an owner in any of the RIA filings or the private placement memorandum for the L3 Capital Income Fund.

149.    These ruffian tactics are all too well known to Cardinale as Giardina, Cardinale and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement and continuing action brought by the New York Attorney General for threatening and abusing consumers. Giardina has repeatedly invoked the

Fifth Amendment in response to questions concerning Cardinale's and others' involvement with that business.

150.     Giardina was also recently found liable under a civil RICO statute in connection with that same business owned with Cardinale in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included **"threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements"** ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us.").

151.     Another judge from the Southern District of New York, Hon. Jed S. Rakoff, recently denied the same company and Giardina's false claims of misappropriations against Feingold.

152.     Feingold and Dazzo have also become aware that Cardinale has siphoned off hundreds-of-thousands, if not more, from a merchant cash advance portfolio known as "Alternative Spin," a portfolio that holds separate funds of AGM to be split equally among Feingold, Dazzo and Cardinale.

153.     Cardinale has also not accounted for the $25,000,000 missing from another merchant cash advance portfolio known "L3SP Alternative Global" (which was funded by AG1). He has just offered a litany of contradictory statements (first claiming the funds were not missing, then claimed they were distributed to his investors, then blaming Feingold and Dazzo and more

recently claiming that "Samson (not me) revalued the portfolios based on defaulting, non-performing, or deals in collections in the portfolio.").

154.     Furthermore, Cardinale has supplied no evidence that Samson "revalued" the portfolios to the tune of tens of millions of dollars, which "revaluation" also makes no sense since under Feingold's stewardship (pre-lock out) the portfolios not only did not lose any money but generated substantial returns. And, if any additional evidence were required to show that Alternative Spin is a portfolio belonging to AGM to be split equally among Feingold, Dazzo and Cardinale (and not L3 or anyone else), there are handwritten notes of Dazzo that were communicated among the three of them concerning this split, emails with the bank concerning the same, text between Cardinale (grey color) and Dazzo (below pictured) and Skype between Feingold and Cardinale (green color) (below pictured), all showing that Cardinale knows exactly what Alternative Spin is for and who it belongs to ("Spin is **our** safety net and **our** growth"). (*See* compilation as **Exhibit 38**). In fact, Cardinale fails to explain, because he cannot, why there would be a separate Alternative Spin portfolio if it is supposed to be the same as the L3SP Alternative Global portfolio. This makes no sense.





155.   Most egregiously, Cardinale has been withdrawing funds from the Alternative Spin portfolio, and upon information and belief has used said monies to personally benefit himself at a minimum and potentially finance his litigation against Feingold and Dazzo with monies that are the ownership of Feingold and Dazzo.

156.   At the time that Feingold sent the Notice of Resignations to Cardinale in January 2022, the Alternative Spin portfolio showed only roughly ▓▓▓▓▓ had been withdrawn from it and all with the unanimous consent of Feingold, Dazzo and Cardinale.

157.   After Feingold provided the Notice of Resignations to Cardinale, Cardinale improperly seized all access to the Alternative Spin portfolio.

158.   Cardinale refused to turn over the documents relating to Alternative Spin until he was forced to in this action. The documents turned over alarmingly disclosed the following:  in or about June 2023, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

 .[16] (*See* **Exhibit 39**). Feingold and Dazzo did not authorize these █████████

in withdrawals by Cardinale.

159.    At the time that Feingold sent the Notice of Resignations to Cardinale and at his

and Dazzo's last access to Alternative Spin records, ████████████████████████████████████

██████████████████ hence confirming that Cardinale has withdrawn ███████ with no

unanimous consent.

160.    The chart below shows ████████████████████████████ has been

withdrawn by Cardinale since Feingold and Dazzo resigned, but most importantly, did not give up

their interest in AGM, the entity that requires unanimous consent in order to make a withdrawal.



---

[16] Succinctly, between the period of time running from Feingold and Dazzo's resignation through
June 2023, Cardinale has improperly withdrawn ████████████ without Feingold and Dazzo's
consent or approval.

161.     In or about September 2023, the Alternative Spin portfolio had then shown withdrawals ███████████████████████████████ that Cardinale improperly seized in or about June 2023. (*See* **Exhibit 40**).



162.     Cardinale belatedly produced additional materials which show, among other things, that in or about **April 2024**, the Alternative Spin portfolio had withdrawals totaling ████████, or an additional ██████ since September 2023 and *an astounding* ██████ *since June 2023*. (*See* **Exhibit 41**).



163.     Cardinale is continuing to misappropriate funds from the AGM Alternative Spin portfolio. Yet again, the Alternative Spin portfolio *does not belong to the L3 Fund,* the Alternative Spin funds were not used to satisfy L3 Fund obligations, as they do not belong to the L3 Fund.

164.     Cardinale cannot possibly claim these funds belong to the L3 Fund because his own audited financials[17] do not include them in the accounting of the note receivable from Alternative Global One LLC.

---

[17] A true and correct copy of the L3 Capital Income Fund, LLC audited financials are annexed hereto as **Exhibit 42**.

**L3 CAPITAL INCOME FUND LLC**
**Schedule of Investments**
**As of December 31,**

| Portfolio Investments | | 2022 Cost | 2022 Fair Value | 2021 Cost | 2021 Fair Value |
|---|---|---|---|---|---|
| Notes receivable-Alternative Global One, LLC | $ | 44,124,833 | $ 44,124,833 | $ 46,793,356 | $ 46,793,356 |
| Notes receivable-Alternative Global Two, LLC | | 17,957,791 | 17,957,791 | 17,957,791 | 17,957,791 |
| Notes receivable-Alternative Global Three, LLC | | 3,846,677 | 3,846,677 | 3,846,677 | 3,846,677 |
| Notes receivable-Alternative Global Four, LLC | | 8,604,361 | 8,604,361 | 8,604,361 | 8,604,361 |
| Notes receivable-Alternative Global Five, LLC | | 831,057 | 831,057 | 300,000 | 300,000 |
| Notes receivable-Alternative Global Six, LLC | | 5,616,250 | 5,616,250 | 5,616,250 | 5,616,250 |
| **Total Notes receivable** | $ | **80,980,969** | **$ 80,980,969** | **$ 83,118,435** | **$ 83,118,435** |

165.     As is clear from Cardinale's *own* L3 Fund audits, the note receivable from Alternative Global One LLC is noted as roughly $44 million.  As shown below in the April 2024 "weekly report" the *amount invested* in the "L3SP" portfolio (at "Beginning Balance Invested") <u>not the Alternative Spin portfolio</u>, is noted at roughly ███████ . (*See* Ex. 41).



166.     Put differently, the AGM Alternative Spin portfolio is not within Cardinale's audit grid because he well knows that the portfolio belongs to Feingold, Dazzo and Cardinale and requires unanimous consent to make a withdrawal and hence his freezing out Feingold and Dazzo's access to view the accounts so that he could continue to pilfer millions of dollars for his own benefit as well as potentially to benefit the payment of his legal fees.  Thus, under Cardinale's own

version, the L3 Fund has no right to the "Alternative Spin" portfolio, but he is continuing to misappropriate funds from the Alternative Spin portfolio.

167.     In addition, **Cardinale has withdrawn an additional $1,415,500 from the "L3SP Alternative Global" merchant cash portfolio of Alternative Global One, LLC** since June 2023 and has provided *no transparency* in proving that the funds were being used in the ordinary course of business, **as required**. To wit, in or about June 2023, the amount withdrawn totaled ██████████. As of the April 2024 weekly report, the amount withdrawn totaled ██████████.

168.     Most significantly, Cardinale does not dispute that he is currently using the assets and funds of AGM by way of withdrawals from the L3SP Alternative Global and Alternative Spin portfolios at Samson Funding.

169.     To try to get around this, Cardinale basically argues that these portfolios are not AGM portfolios. This is utterly false. AGM is the 100% owner of AG 1-6 as reflected on AGM's tax returns and other proofs. Cardinale denies the tax returns and other proofs, and claims that AGM merely has a "profit participation" in AG 1-6 although he recently testified that he was unaware of any contract between AGM and the Alternative Numbered Entities.

170.     Not surprisingly, AGM's tax returns (AG 1-6 are disregarded entities that do not file returns) reflect this portfolio activity at Samson Funding. These portfolios are not L3 assets. L3 is a lender. The assets are owned by AGM as reflected on AGM's tax returns. For example, in a draft of the 2019 tax return for AGM (and related email) it specifically reports $350,000 for "Spin" and ████████████████████████████████████ *Compare* **Exhibit 43** (email with draft 2019 AGM tax return) and **Exhibit 44** (final 2019 AGM tax return).

**Statement 5 - Form 1065, Schedule L, Line 8 - Other Investments**

| Description | Beginning of Year | End of Year |
|---|---|---|
| MCA INVESTMENTS | $ | $   5,500,000 |
| SAMSON | | 6,350,000 |
| SAMSON – SPIN | | 350,000 |
| TOTAL | $            0 | $  12,200,000 |



FACTUAL ALLEGATIONS RELATED TO ALTER EGO – REVERSE PIERCING DOCTRINE

171.    Upon information and belief, Cardinale has formed and/or used RVCSI and RVCNY for the purpose of defrauding creditors and secreting assets in order to evade liability for preexisting personal liability, including in connection with the claims and liabilities at issue here.

172.    Cardinale thoroughly dominates and controls these entities, and always has, to such an extent that, in reality, there is no separate existence and the entities were and are, in fact, alter egos of Cardinale.

173.    Cardinale testified in this case that RVCNY is merely a "flow-through" entity that made two investments in 2007 and 2015 (in Richmond Capital Group LLC n/k/a RCG Advances LLC and Red Zone) and engages in no other activity or business even though he later claimed the entity was actually formed in 2016. He further testified that he took the Red Zone entity on just for structure as a "set aside corporation." Cardinale further testified that Cardinale and Vania are the only owners ever of RVCNY and that Cardinale has been the only manager ever of RVCNY.

However, in the Form ADV, Part 2B, dated March 29, 2019, for Cardinale's L3 Capital Advisors RIA, it states that:

      i.    Cardinale receives substantial compensation in connection with his ownership of 50% of the outstanding membership interests in each of L3 Capital Management LLC, RVCNJ LLC and RVCNY.

     ii.    Each of these entities invest hold passive investments in various businesses on behalf of Cardinale. Cardinale is not involved in the management of each of these entities.

   iii.    L3 Capital believes that these ownership interests do not pose any conflicts of interest to clients.

174.   Thus, if Cardinale, as he represented in the Form ADV, is not involved in the management of each of these entities, including RVCNY and L3 Capital Management, for which Cardinale receives "substantial compensation," then Vania, as the only other owner ever in both of those entities, would naturally have those management duties, but Vania testified in this case that she has no knowledge about anything concerning the affairs of RVCNY or L3 Capital Management. ███████████████████████████████████ ███████████████████████████████████ Further, Cardinale testified here that he has been the only manager ever of RVCNY, but his Form ADV claims he is "not involved in the management of each of these entities."  In addition, Cardinale testified that he owns various DCG ("**D**azzo **C**ardinale **G**iardina") entities via L3 Capital Management, as well.

175.   Cardinale further testified that RVCNY never had: any officers or directors, physical office space, computers, employees, independent contractors, dedicated email address,

business, business operations, phone number, reports, research, marketing, analysis, member meetings, committee meetings, resolutions, members consents, W-2s or 1099s.

176.     Cardinale testified in this case that RVCSI is merely a "flow-through" entity that was formed in 2020 solely to receive funds and money from AGM. Cardinale further testified to being the only owner and manager ever of RVCSI and that it never had: any officers or directors, physical office space, computers, employees, independent contractors, dedicated email address, business, business operations, phone number, reports, research, marketing, analysis, member meetings, committee meetings, resolutions, members consents, W-2s or 1099s.

177.     Cardinale could not articulate any legitimate purpose for the entities. Vania's initials have been used in each of the Defendant entities and as Cardinale admitted to Feingold, he keeps all of the original books of said entities and he has a practice of switching original documents depending on the circumstance as an asset protection measure. In particular, with one company, the original books and records including the operating agreement signature page was often switched depending on the situation in order to shield Cardinale as this is his regular practice of not holding corporate meetings or formalities or regular minutes or notes so that he can easily switch out and remove himself or his wife or add them or other entities. Likewise, Cardinale openly admitted to Feingold that one of his asset protection strategies was to selectively claim his wife was involved in his companies if it allowed him to make the company look like a multi-member LLC for multi-member protections, but in other instances he would change her involvement if her not being involved was to his benefit.

178.     In fact, Cardinale with the assistance of his wife intentionally kept no books and records nor resolutions nor corporate minutes of the two Defendant entities including as admitted in his wife's deposition, no formal meetings or records of the same and as she further showed in

her deposition she was not even able to explain what the businesses did as they operated with no corporate formalities so that they could easily change records or claim to not have records in order to avoid liability and collectability depending on the circumstance.

179. Vania could not articulate any legitimate purpose for the entities. Vania repeatedly stated during her deposition in this case that she did not know anything about the entities, and that she would just sign any paperwork Cardinale would put in front of her even though Cardinale has also admitted it was possible that Vania Cardinale had signing authority over RVCNY bank accounts, had authority to sign agreements for RVCNY and it was possible that Vania could log into bank accounts for RVCSI.

180. Vania further testified at her deposition in this case to a complete lack of knowledge or understanding as to her involvement of her participation in these entities except for the obvious purpose of using her as a shield against creditors that she agreed to and that she is also the Trustee for the RVC L3 Family Trust but does not know what her duties are nor has she participated in any meetings or any formalities thus showing the entities are frauds as real entities with real business purposes would follow the required business formalities.

181. Moreover, in 2019, Cardinale conveyed to Feingold that Cardinale used his entities and often included Vania as a fake participant to protect himself as she had a past which would not provide any rationale to have her involved in businesses as she had no education or training in operating businesses and her work experience did not make her an appropriate candidate for anything other than using her name as a straw person. At one point, a clearing firm even raised an issue regarding Vania being titled on an account as it appeared inappropriate, and which Cardinale reacted about the clearing firm comment and claimed that they should butt out of his personal affairs as the way he used his wife's name was for asset protection, that everyone knew she really

had no business involvement other than Cardinale using her name as an asset protection ploy and that he felt it was a smart asset protection practice to use his wife's name in businesses.  In fact, Vania was getting paid compensation through an account normally only permitted to be paid to a licensed person being on such an account and Cardinale admitted to Feingold in multiple conversations regarding Vania's usage in Cardinale's myriad of businesses including the example above. There were additional conversations between Feingold and Cardinale during which Cardinale stated that he used Vania as a straw person to hide and protect assets and which others warned Cardinale that such conduct was troublesome. Further, Feingold is aware that RVCNY has changed its members/managers depending on the assets as Cardinale has admitted.

182.    Cardinale has been aware of Feingold and Dazzo's questioning his representations to them at least since 2021 and prior to Feingold and Dazzo questioning him, Cardinale also became concerned that other lawsuits and claims against him might be arising as stories in the press about one business, Richmond Capital Group LLC (n/k/a RCG Advances LLC), began to arise indicating potential liabilities.  Cardinale was and is an owner Richmond Capital Group LLC (n/k/a RCG Advances LLC) and has now taken to completely distance himself from that entity with the potential exposure arising from that entity from the FTC action, NY Attorney General action and other matters. Further, Cardinale also became aware of a number of his other investments not performing well, including his ventures in such businesses as real estate development, stocks such as Graphoid and individual businesses and he recognized that he might become the subject of lawsuits or government actions and hence he created transfers to fake entities that had no business purpose in order to avoid claims of creditors.

183.    Cardinale has undergone a fraudulent practice of fraudulently conveying his assets as well as assets of AGM to RVCSI and RVCNY.  Thus, for instance, AGM made management

fee payments to RVCSI, LLC (between July 24, 2020 and April 8, 2022) of $3,263,055.05, and at his deposition Cardinale testified that RVCSI "received compensation" that was sent to it.  Thus, Cardinale's dominated and controlled entities assisted Cardinale in diverting investor funds and/or payments which should have been paid to investors as part of their return on investment by accepting funds from L3 and/or Cardinale directly. As such, they are required to return the money received from the fraudulent activity.

184.    In addition to the above-described acts, Cardinale paid unsubstantiated compensation to Vania, and made unsubstantiated payments to other entities Cardinale created to assist in hiding the fraudulent activity described herein, including RVCNY and RVCSI.

185.    Furthermore, Cardinale was aware of the fraudulent activity he engaged in herein, his breaches of fiduciary duty, his conversion and other improper conduct, and liability to the Feingold and Dazzo, and has continued to use throughout RVCNY and RVCSI to defraud creditors and secret assets in order to evade liability to Feingold and Dazzo.

186.    RVCNY and RVCSI are part and parcel to the activities of Cardinale, and his alter egos, and assisted Cardinale in committing the fraudulent and improper activities described herein and they are liable to the same extent as Cardinale for the damages of the Feingold and Dazzo because they are merely alter egos of Cardinale.

187.    All conditions precedent to bringing these additional claims have been satisfied, waived or rendered unnecessary due to futility.

### FIRST CAUSE OF ACTION
**(Plaintiffs Against Cardinale for Declaratory Judgment)**

188.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-89 as if fully as set forth in length.

189.    The actual member of the Alternative Numbered Entities is AGM, of which

Feingold, Dazzo and Cardinale are the ultimate member managers.

190.    Cardinale, as the sole manager of the Alternative Numbered Entities, owes a duty of loyalty to Feingold and Dazzo through their ultimate ownership of AGM. (*See* Exhs. 2-7, Section 11.1)

191.    Part of Cardinale's duty of loyalty as manager of the Alternative Numbered Entities is "holding as trustee for [the Company], an[y] property, profit, or benefit derived by the Manager in the conduct . . . of the Company's business."

192.    By falsely claiming, however, that he is the sole member of the Alternative Numbered Entities in each of the Unauthorized Lawsuits, Cardinale has taken the position that anything derived from his conduct as manager of the Alternative Numbered Entities is ultimately to be held for himself only rather than AGM (of which Feingold and Dazzo are ultimate members).

193.    Through such actions, Cardinale has violated and continues to violate the duty of loyalty he owes AGM, and its ultimate beneficiaries, Feingold and Dazzo, by: (i) filing lawsuits that subvert Feingold and Dazzo's interests in AGM and (ii) claiming for himself all benefits derived from his conduct as manager of the Alternative Numbered Entities.

194.    The Operating Agreements for the Alternative Numbered Entities each state that "[t]he consent of all Members [here AGM] will be required to approve . . . the authorization or ratification of acts that would otherwise violate the duty of loyalty."

195.    Cardinale, Feingold and Dazzo agree that their unanimous consent is required for AGM to act in a manner that would otherwise violate the duty of loyalty.

196.    Cardinale has never sought or received such consent from Feingold or Dazzo for his actions, however.

197.    In addition, Section 8.1(c) of each Operating Agreement for the Alternative

Numbered Entities states:

> In the event that there is any ambiguity, contradiction or disagreement between the vote or desires of the initial members listed in this Operating Agreement [Feingold, Dazzo and Cardinale] and any other future members or series of member [AGM, whose ultimate managing members are Feingold, Dazzo and Cardinale], then the ultimate decision shall be in the sole and absolute discretion of the unanimous consent of the above listed initial members whose names appear in Article IV, subsection 4.1 [Feingold, Dazzo and Cardinale].

198.    The Unauthorized Lawsuits cannot continue pursuant to Section 8.1(b)(4) or Section 8.1(c) of the Operating Agreements of the Alternative Numbered Entities without the unanimous consent of Cardinale, Feingold and Dazzo.

199.    No agreement to file or pursue Cardinale's Unauthorized Lawsuits has ever existed amongst Cardinale, Feingold and Dazzo.

200.    Despite this, Cardinale filed the Unauthorized Lawsuits and continues to pursue them.

201.    There is an existing and actual legal controversy that can be effectively resolved by a declaratory judgment regarding (1) whether AGM owns the Alternative Numbered Entities and (2) whether Cardinale's Unauthorized Lawsuits may proceed without Feingold or Dazzo's agreement.

202.    Plaintiffs therefore seek and are entitled to a declaration that AGM owns the Alternative Numbered Entities, as well as a declaration that Cardinale's Unauthorized Lawsuits cannot proceed without Feingold and Dazzo's consent.

203.    Pursuant to Federal Rule of Civil Procedure 65, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent authority, Plaintiffs also seek a preliminary anti-suit injunction prohibiting Cardinale from proceeding with Cardinale's Unauthorized Lawsuits pending the Court's decision on the declaratory judgments. Plaintiffs also seek a permanent injunction

enforcing the declaratory judgments pursuant 28 U.S.C. § 2202 by requiring Cardinale and his affiliates, as well as any other parties through or in concert with Cardinale, to comply with this Court's declarations.

204.    Plaintiffs are entitled to a preliminary anti-suit injunction because the parties in the lawsuits are effectively the same and resolution of this case is dispositive of Cardinale's Unauthorized Lawsuits. Moreover, (1) Plaintiffs are likely to succeed on the merits of their declaratory judgment claim; (2) further harm to Plaintiffs, including, but not limited to, their business reputations, brand and goodwill constitutes an imminent threat of irreparable harm; (3) the balance of the equities favors injunctive relief because Plaintiffs will be irreparably harmed, while restraining Cardinale from using the Alternative Numbered Entities to harm Plaintiffs without Feingold or Dazzo's agreement will not harm Cardinale; and (4) the public interests in limiting meritless and duplicative litigations and in enforcing contracts favor injunctive relief.

### SECOND CAUSE OF ACTION
**(Feingold and Dazzo Against Cardinale, RVCSI and RVCNY for Payment of Fair Value)**

205.    Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

206.    On January 28, 2022, Feingold and Dazzo provided their Notice of Resignations to Cardinale and, as ultimate owners of AGM, demanded their respective interests in the Alternative Numbered Entities be redeemed pursuant to Delaware law.

207.    Cardinale received and acknowledged the resignations and the demands for the fair value of Feingold and Dazzo's ultimate interests.

208.    Cardinale has nonetheless refused to comply. Cardinale has not paid Feingold and Dazzo fair value for their ultimate interests despite admitting in open court here that they are owed their fair value.

209.     Upon information and belief, Cardinale is making payments out of the Alternative Global Entities without proper corporate approvals and treating all of said entities as his own when, in fact, any actions to be taken involving the Alternative Global Entities require corporate formalities and approvals by Feingold and Dazzo which are being completely disregarded.

210.     As a direct and proximate result of Cardinale's violation of his lawful obligations, Feingold and Dazzo have been damaged to the full extent of the fair value required to be paid under Delaware Code § 18-604 and additional damages incurred.

### THIRD CAUSE OF ACTION
**(Feingold and Dazzo Against Cardinale, RVCSI and RVCNY for Breach of Fiduciary Duty)**

211.     Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

212.     As a manager of the Alternative Global Entities, Cardinale owes both members and fellow managers of these entities the basic fiduciary duties of care and loyalty, which includes good faith, oversight, and disclosure.

213.     Cardinale breached his fiduciary duties by, among other things, failing to do the tasks which he represented that he was providing, failing to make material disclosures, concealment and by putting his personal interests above the interests of the entities or its members.

214.     Cardinale further breached his fiduciary duty by, among other things, misappropriating funds from AGM.

215.     Cardinale's breach of fiduciary duties proximately caused damages to Feingold and Dazzo in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Feingold and Dazzo Against Cardinale, RVCSI and RVCNY for Conversion)**

216.    Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

217.    Feingold and Dazzo remain as ultimate managers and members of AGM.  As ultimate managers and members of that entity, Feingold and Dazzo have an equal ownership right and equal rights to access the bank accounts and all assets of that entity.  Still, Cardinale, without authorization from Feingold and Dazzo, has taken funds from AGM's accounts. Cardinale has also blocked Feingold and Dazzo from accessing these accounts to discover the amount taken.

218.    Further, Cardinale is believed to have siphoned off at least ███████ from Alternative Spin for his benefit and without approval by Feingold and Dazzo. Upon information and belief, he is taking assets from the Alternative Global Entities without proper authorization and approval. Cardinale has financed a multiplicity of court actions against and/or involving Feingold and Dazzo and AG 1-6 and has mysteriously refused to account for where he has spent the money at issue here.  It is undisputed that Cardinale has usurped control over the Alternative Spin portfolio.

219.    At the time that Feingold sent the Notice of Resignations to Cardinale in January 2022, the Alternative Spin portfolio showed only roughly ███████ had been withdrawn from it and all with the unanimous consent of Feingold, Dazzo and Cardinale.

220.    After Feingold and Dazzo sent the Notice of Resignations to Cardinale, Cardinale improperly seized all access to the Alternative Spin portfolio.

221.    Cardinale has refused to turn over all documents relating to Alternative Spin.  He was forced to turn over Alternative Spin records in this action, however, which most alarmingly disclosed the following: in or about 2023, the Alternative Spin portfolio was valued at

███████████████████████████████████████████████[18] (*See* Ex. 39).[19] Feingold and

Dazzo did not authorize these millions in withdrawals by Cardinale.

222.    At the time that Feingold sent the Notice of Resignations to Cardinale and at

Feingold and Dazzo's last access to Alternative Spin records, the value of Alternative Spin was

nearly ████████████ greater. Hence confirming that Cardinale has withdrawn ██████ with

no unanimous consent.  Even more shocking is that in the records ordered turned over and against

Cardinale's objections, it appears that withdrawals continue on a monthly basis as the invested

portfolio continues to generate returns.

223.    Cardinale has thus deprived Feingold and Dazzo of these funds and any assets

related thereto. This deprivation conflicts with Feingold and Dazzo's ownership interests in the

account and any assets related thereto.

224.    Cardinale's conversion of these funds has proximately caused damages to Feingold

and Dazzo in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (Feingold and Dazzo Against Cardinale, RVCSI and RVCNY for Fraudulent Misrepresentation)

225.    Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs

as if fully stated herein.

226.    By stating to Feingold and Dazzo he had properly disclosed his conflicts of interest

and his compensation and monetary benefits from the Alternative Global Entities with his

investors in L3 Capital Income Fund, Cardinale made false statements about a material fact.

---

[18] Succinctly, between the period of time running from the Notice of Resignations through June 2023, Cardinale has improperly withdrawn ████████████ without Feingold and Dazzo's consent or approval.

[19] **Exhibit B** bates range of CARDINALE_00211669

227.    When Cardinale made these false statements to Feingold and Dazzo, Cardinale intended that his false statements would induce Feingold and Dazzo to allow Cardinale to be a manager and member of the Alternative Global Entities.

228.    In 2019, and right before incorporating AGM, a discussion was had between Feingold, Dazzo and Cardinale about concerns that Cardinale would be a manager of Alternative Global Entities and a manager of L3 Capital Income Fund, his various sources of compensation and the legal disclosures he needed to make. Cardinale stated that he knew his disclosure obligations, intended to make detailed disclosures, and that all of his roles and compensation would be disclosed to his investors in his income fund.

229.    As described, Cardinale represented that he knew his disclosure obligations, and that he would make detailed disclosures, and that all his roles, compensation and monetary benefits would be properly disclosed to his L3 investors.

230.    After this litigation commenced, it was discovered that Cardinale never made such lawfully required disclosures and he misrepresented that he did to keep Feingold and Dazzo as his co-managers in the Alternative Global Entities. Had Feingold and Dazzo known about Cardinale's material misrepresentations, as described herein, they would have never commenced or continued to do any business with Cardinale as it is believed his failed disclosures are civil violations, if not worse.

231.    In order to fraudulently induce Feingold and Dazzo, Cardinale represented he was a successful real estate developer and largest developer in Leesburg, Florida and was making millions, when, in reality, Cardinale made no money in Leesburg, Florida.

232.     In order to fraudulently induce Feingold and Dazzo, Cardinale represented that he developed 20 apartment buildings in New York, when, in reality, he simply bought twenty low rent apartments and did not do any development.

233.     In order to fraudulently induce Feingold and Dazzo, Cardinale represented that he successfully developed a high-priced condo, when, in reality, Cardinale made no money, and was not successful.

234.     In order to fraudulently induce Feingold and Dazzo, Cardinale represented that he had an unblemished record in finance/real estate, when, in fact, Cardinale was sued about a failed real estate deal and has had constant issues with clients and parties in the brokerage community throughout his career.

235.     In order to fraudulently induce Feingold and Dazzo, Cardinale represented that he has a gold fund where people made six times their money and it was going public, when, in reality, no one has made money but Cardinale charging fees and the fund never went public.  Nearly one year after this lawsuit has been filed, the gold fund still had not gone public (missing many promised dates of public filing) even though nearly two years before this lawsuit, Cardinale claimed that some investors had already six-timed their money.

236.     In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he raised over $30 million for a company called Graphoid where all investors made money and that the company was going public, when, in reality company never went public, he made money on the fees and his investors did not even make back their investment.

237.     In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he produced a successful motion picture, when, in reality, no one made money but him for the fees he charged to raise the money.

238.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he successfully ran multiple debt settlement companies, when, in reality, he made fees charging people to participate and raising money but the companies showed significant losses.

239.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he made significant returns in the payday lending business with Sky Capital, when, in reality he lost millions, did not disclose the losses to his investors and paid money back to investors with returns from other deals in order to hide losses.

240.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he had a successful sports bar operation in Leesburg, Florida, when, in reality, the business lost money and was shut down.

241.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he had a high-end successful coffee shop in New York, when, in reality, the business never even opened and money was lost.

242.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he was opening tattoo parlors and acquired the equipment, when, in reality, he was unable to open a single parlor.

243.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he had a scrap metal operation in Brazil that was successful, when, in reality, it generated no profits.

244.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed he was a successful international developer including successful development of townhomes in Brazil, when, in reality, he did not make any money on the project.

245.    In order to fraudulently induce Feingold and Dazzo, Cardinale claimed that in 2006 he made so much money as a real estate developer that he could retire and was only working

because he enjoyed training young people, when, in reality, he did not have enough success in real estate industry which would allow him to retire in 2006.

246. In order to fraudulently induce Feingold and Dazzo, Cardinale also falsely represented his previous investment track record of investment returns as well as other investment returns, he was able to obtain. Cardinale also made this materially false representation with the intent of obtaining additional compensation for his purported investment expertise.

247. Cardinale made all these representations beginning in or about July 2019 and through November 2019, knowing they were false, with the intent of Feingold and Dazzo relying on these representations with the objective to induce them into and continue the business relationship with Cardinale described herein.

248. Had Feingold and Dazzo known about Cardinale's material misrepresentations they would have never commenced or continued to do any business with Cardinale as described herein and they would not have ceded a one-third interest in the Alternative Global Entities to him.

249. Feingold and Dazzo have been injured and damaged by justifiably relying on Cardinale's material misrepresentations and omissions in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (Feingold and Dazzo Against Cardinale, RVCSI and RVCNY for Fraudulent Misrepresentations)

250. Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

251. Feingold and Dazzo allowed Cardinale to be paid for administrative support for the Alternative Global Entities. Feingold and Dazzo allowed to be paid the monthly administrative expenses from L3 Capital Management with the understanding that all back-office services for the Alternative Global Entities were to be performed by Cardinale.

252.    In addition, Cardinale received advisory fees because of his representations of extensive business experience and success and oversight overall of all businesses through L3 Capital Advisors. Feingold and Dazzo allowed this "advisory fee" to cover Cardinale's claimed additional services. All the extra fees were a sham and Cardinale's representations of extensive business success were false.

253.    Cardinale did not act as an advisor as he had agreed and he submitted false and inflated expenses to allow him to use an American Express Black Card and pay other personal expenses, none of which were for the Alternative Global Entities.  Instead, the submitted expenses were for his personal expenses or expenses for his L3 Capital Income Fund which were not proper business expenses. In addition, Cardinale apparently did not use the billed administrative expenses to do all the books and records and services represented.

254.    When Cardinale represented to Feingold and Dazzo these charges were for legitimate administration costs and legitimate advisory services, Cardinale knew these representations were false. Cardinale intended these false representations would induce Feingold and Dazzo to allow these illegitimate payments. Each month, Cardinale submitted a request for his fees and expense reimbursements and those reimbursements were materially false and used in part to defray his personal, non-business expenses.

255.    In addition, Cardinale received an advisory fee through L3 Capital Advisors which was to compensate him for advising and operating the Alternative Global Entities operations and investments, among other fees, because of his false representations of extensive business experience and success and oversight over all the businesses, however, Cardinale now claims that he was not involved with the day-to-day operations, or "advising," and his role was to "raise capital."

256.     Cardinale further omitted material facts related to his past experience with investors, business partners and in the financial industry. Indeed, Cardinale omitted the fact that he has received numerous complaints from customers, clients and business partners. Cardinale went even further to conceal these materials omissions by stating that he had a "spotless record."

257.     Feingold and Dazzo have suffered damages in justifiable reliance on Cardinale's material misrepresentations and omissions in an amount to be determined at trial.

<u>SEVENTH CAUSE OF ACTION</u>
**(Feingold and Dazzo Against Cardinale and Vania for Conspiracy to Commit Fraud)**

258.     Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

259.     Cardinale and Vania agreed to perpetrate a fraud on Feingold and Dazzo and agreed to a conspiracy to do an unlawful act or to do a lawful act by unlawful means.

260.     Cardinale's participation in the conspiracy, overt acts in pursuit of the conspiracy and his various misrepresentations and omissions, are described herein.

261.     Vania was aware of some or all of Cardinale's false representations and omissions alleged herein in furtherance of the conspiracy.

262.     Vania participated in the conspiracy as well as personally benefiting thereby by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of about $1.6 million to L3 Capital Management, █████████████████████████████████████████ ████████████████████████ and over $3 million in payments to RVCSI ("Richard Vania Cardinale Staten Island") from AGM  and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY and access to bank accounts for RVCSI.

263.     Vania engaged in overt acts in pursuit of the conspiracy as described herein, including, but not limited to, her actions and conduct in furtherance of Cardinale's sham entities described above, one of which received millions of dollars from AGM and another over $3 million, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the fraud and conspiracy, in which Cardinale directed funds from the Alternative Global Entities to be directed to, as well as receiving funds from various entities involved in this matter without providing services to, or on behalf of, such entities.

264.     Feingold and Dazzo have suffered damages due to the acts performed by Cardinale and Vania in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
**(Feingold and Dazzo Against Cardinale and Vania for Conspiracy to Commit Fraud)**

265.     Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

266.     Cardinale and Vania agreed to a conspiracy to do an unlawful act or to do a lawful act by unlawful means as described herein, including breaching the fiduciary duties alleged herein, conversion and other improper conduct alleged herein.

267.     Cardinale's participation in the conspiracy, overt acts in pursuit of the conspiracy and his various breaches, conversion and other improper conduct, are described herein.

268.     Vania participated in the conspiracy as well as personally benefiting thereby by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of $1.6 million to L3 Capital Management, ███████████████████████████████████

████████████████████ and over $3 million in payments to RVCSI ("Richard Vania Cardinale Staten Island") from AGM and her apparent signing authority over RVCNY bank accounts, authority to sign agreements for RVCNY and access to bank accounts for RVCSI.

269.    Vania engaged in overt acts in pursuit of the conspiracy as described herein, including, but not limited to, her actions and conduct in furtherance of Cardinale's sham entities described above, one of which received millions of dollars from AGM and another over $3 million, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the breaches and conspiracy, in which Cardinale directed funds from the Alternative Global Entities to be directed to, as well as receiving funds from various entities involved in this matter without providing services to, or on behalf of, such entities.

270.    Feingold and Dazzo have suffered damages due to the conspiracy and the acts performed in furtherance of it in an amount to be determined at trial.

### NINTH CAUSE OF ACTION
**(Feingold and Dazzo Against Vania for Aiding and Abetting Breach of Fiduciary Duty)**

271.    Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

272.    Cardinale owed a fiduciary duty to Feingold and Dazzo by virtue of being a member and manager of the Alternative Global Entities.

273.    Cardinale breached his fiduciary duties by, among other things, failing to do the tasks which he represented that he was providing, failing to make material disclosures, concealment and by putting his personal interests above the interests of the entities or its members.

274.     Cardinale further breached his fiduciary duty by, among other things, misappropriating funds from AGM and the assets that AGM is entitled to.

275.     Vania Cardinale had knowledge of these breaches as well as personally benefiting from them by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of $1.6 million to L3 Capital Management, ███████████████████████████████████████████ and over $3 million in payments to RVCSI ("Richard Vania Cardinale Staten Island") from AGM and her apparent signing authority over RVCNY bank accounts, authority to sign agreements for RVCNY and access to bank accounts for RVCSI.

276.     Vania substantially assisted the wrongdoing, by among other things, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the breaches and scheme, in which Cardinale directed funds from the Alternative Global Entities to be directed to.

277.     Feingold and Dazzo have suffered damages due to Vania's aiding and abetting Cardinale's breach of fiduciary duty to Feingold and Dazzo in an amount to be determined at trial.

### TENTH CAUSE OF ACTION
### (Feingold and Dazzo Against Cardinale, RVCSI and RVCNY for Unjust Enrichment)

278.     Feingold and Dazzo repeat and reallege the allegations in the preceding paragraphs as if fully stated herein.

279.     Feingold and Dazzo paid Cardinale millions in administrative fees, advisory fees, management fees and acquisition fees. Feingold and Dazzo also invested in the Alternative Numbered Entities, which Cardinale now improperly controls.

280.    By paying Cardinale for services and the aforementioned fees and investing in the Alternative Numbered Entities, Feingold and Dazzo conferred a direct benefit on Cardinale.

281.    Cardinale did not perform the services for which he was paid.

282.    Cardinale wrongfully retained the benefits he received from Feingold and Dazzo.

283.    Cardinale continues to retain and benefit from what he received from Feingold and Dazzo without conferring on Feingold and Dazzo the value in return.

284.    A reasonable person receiving what Cardinale received would normally expect to provide services or other benefits in return.

285.    Allowing Cardinale to retain these benefits would be inequitable.

## DEMAND FOR JURY TRIAL

286.    Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs ask this Court to grant the following relief:

a.     A declaration that AGM owns the Alternative Numbered Entities.

b.     A declaration that Cardinale's Unauthorized Lawsuits cannot proceed without Feingold and Dazzo's consent.

c.     A preliminary anti-suit injunction precluding Cardinale from proceeding with Cardinale's Unauthorized Lawsuits pending the Court's decision on Plaintiffs' claim for a declaratory judgment.

d.     A permanent injunction enforcing the declaratory judgment by requiring Cardinale and his affiliates, as well as any other parties acting through or in concert with Cardinale to comply with the Court's declarations.

e.      A judgment in accordance with the relief sought in the Second through Tenth Causes of Action, including, but not limited to, monetary damages, compensatory damages, consequential damages, and punitive damages.

f.      An award of all reasonable attorneys' fees to the extent such may be allowable by law.

g.      An award of allowable costs and expenses.

h.      An award of pre-judgment and post-judgment interest.

i.      For such other and further relief as the Court deems just and proper.

Dated: September 11, 2024                        Respectfully submitted,

**DANIELS, RODRIGUEZ, BERKELEY,**          **CLARKE SILVERGLATE, P.A.**
**DANIELS & CRUZ P.A.**

By: */s/ Lorne E. Berkeley*                     By: */s/ Spencer H. Silverglate*
Lorne E. Berkeley, Esq.                         Spencer H. Silverglate, Esq.
Florida Bar No. 146099                          Florida Bar No. 769223
490 Sawgrass Corporate Parkway, Suite 320       Ana Sarmento, Esq.
Sunrise, Florida 33325                          Florida Bar No. 1025053
Telephone: (954) 577-8332                       5301 Blue Lagoon Dr., Suite 900
LBerkeley@drbdc-law.com                         Miami, Florida 33126
                                                Telephone: (305) 377-0700
                                                ssilverglate@cspalaw.com
                                                asarmento@cspalaw.com

**WELTZ KAKOS GERBI WOLINETZ**               **GALLIVAN WHITE BOYD P.A.**
**VOLYNSKY LLP**

Thomas Scot Wolinetz, Esq.                      John T. Lay, Jr., Esq.*
Florida Bar No. 1001160                         Ioannis (Ian) G. Conits, Esq.*
1 Old Country Road, Suite 275                   55 Beattie Place, Suite 1200
Carle Place, New York 11514                     Greenville, South Carolina 29601
Telephone: (516) 506-0561                       Telephone: (864) 271-5432
twolinetz@weltz.law                             jlay@gwblawfirm.com
                                                iconits@gwblawfirm.com
                                                * Admitted Pro Hac Vice

*Attorneys for Plaintiffs*
*David Feingold and Michael Dazzo*              *Attorneys for Plaintiff Blackstream*
                                                *Development, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 11, 2024, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF.

By: <u>*/s/ Spencer H. Silverglate*</u>
Spencer H. Silverglate